In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re In Proceedings for the REORGANIZATION OF A RAILROAD.

No. 70–347.

United States District Court, E. D. Pennsylvania.

May 2, 1974.

Paul Duke, James Howard, John B. Rossi, Jr., and John De Podesta, Philadelphia, Pa., and Covington & Burling by Charles Horsky, Washington, D.C., for the trustees, Penn Cent. Trans. Co.

James William Moore, Philadelphia, Pa., Sullivan & Worcester by Joseph Auerbach, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford Railroad Co.

James F. Dausch, Dept. of Justice, Washington, D.C., for the United States of America.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, and Alan Fellheimer, Philadelphia, Pa., for Girard Trust Bank and indenture trustees.

Willkie, Farr & Gallagher by Walter H. Brown, Jr., and Louis A. Craco, New York City, and Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, Philadelphia, Pa., for Institutional Investors Penn Cent. Group.

Rogers & Wells by William R. Glendon, New York City, and Clark, Ladner, Fortenbaugh & Young by William Charles Hogg, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., and Shearman & Sterling by Robert H. Mackinnon, W. Foster Wollen, New York City, and David Blau, for First National City Bank of New York.

David Berger, P. A. by David Berger, and Edward Rubenstone, Philadelphia, Pa., for Penn Cent. Co.

White & Case by Donald M. Wilkinson, Jr., Barry S. Greene, and Edmond C. Gregorian, New York City, for Bankers Trust Co., as indenture trustee.

Proskauer, Rose, Goetz & Mendelsohn by Philip M. Hahn, New York City, for The Bank of New York, as indenture trustee.

Reed, Smith, Shaw & McClay by Andrew N. Farley, Pittsburgh, Pa., for Mellon Bank, N.A.

Richards, Layton & Finger by Richard G. Elliott, Jr., Wilmington, Del., for Wilmington Trust Co., as indenture trustee.

O'Connell & Aronowitz by Cornelius D. Murray, Albany, N.Y., for National Commercial Bank & Trust Co. of Albany, New York.

Winthrop, Stimson, Putnam & Roberts by Edward A. Christensen, New York City, for Irving Trust Co., as indenture trustee.

Curtin & Heefner by Edward I. Dobin, Morrisville, Pa., for The Bank of New Jersey.

Morgan, Lewis & Bockius by John N. Schaeffer, Jr., and Edward B. Cloues,

II, Philadelphia, Pa., for The Fidelity Bank.

Kelley, Drye, Warren, Clark, Carr & Ellis by Robert J. Minyward, and William F. Sorin, New York City, for Manufacturers Hanover Trust Co.

Wolf, Block, Schorr & Solis-Cohen by Michael L. Temin, Philadelphia, Pa., for First Pennsylvania Banking & Trust Co., indenture trustee.

Sharon, Pierson, Semmes, Crolius & Finley by William T. Finley, Jr., Washington, D.C., for Pennsylvania Co.

Marsh, Day & Calhoun by Peter Wilkinson, Bridgeport, Conn., for The City National Bank of Connecticut.

Winne & Banta by Peter G. Banta, Hackensack, N.J., for Peoples Trust of New Jersey, indenture trustee.

Migdal, Tenney, Glass & Pollack by Lester C. Migdal, New York City, for New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee.

Leon Leighton, New York City, for minority stockholders of Mahoning Coal Railroad.

Tyler, Cooper, Grant, Bowerman & Keefe by Lawrence W. Iannotti, New Haven, Conn., for L. W. Iannotti, successor indenture trustee of New York, New Haven & Hartford First Mortgage Bonds.

Gordon P. Macdougall, Washington, D.C., for Commonwealth of Pennsylvania.

Leroy D. Touchton, Deputy Atty. Gen., for the State of New Jersey.

John C. McTiernan, Albany, N.Y., for New York State Dept. of Trans.

William J. Rubin, Asst. Atty. Gen., for the State of Maryland.

Mulholland, Hickey & Lyman by Geoffrey N. Zeh, Washington, D.C., for Railway Labor Executives' Association.

Joseph A. Schafer, C.P.A., appearing on his own behalf as independent minority stockholder.

Richard H. Streeter, Washington, D. C., for Interstate Commerce Commission.

MEMORANDUM AND ORDER NO. 1543, and FINDINGS PURSUANT TO THE FIRST SENTENCE OF § 207(b) of the Regional Rail Reorganization Act of 1973

FULLAM, District Judge.

Section 207(b) of the Regional Rail Reorganization Act of 1973 (hereinafter the "Act"), provides:

"Within 120 days after the date of enactment of this Act each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. § 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act. . . ."

The Debtor is a "railroad in reorganization" as defined in the Act. The statute became effective January 2, 1974, which means that the decision as to reorganizability is to be made not later than May 2, 1974.

By Order No. 1426, this Court directed that a hearing be held on March 25, 1974, in relation to the decision required by the quoted language of the statute, and invited all interested parties, at stated times in advance of the hearing, to specify and brief the legal and factual issues they deemed relevant to the required determination. In response to this invitation, a wide range of questions have been briefed and presented, but in view of the factual record developed at the hearing, not all of these issues need now be discussed.

I.  *Jurisdictional and Other Preliminary Issues*

It is necessary to note at the outset that the constitutionality of the Act is

being challenged on a variety of grounds in other litigation now pending in this District and elsewhere.[1] Many of the same constitutional issues have been raised in the present proceeding. For the most part, they will not now be considered. Apart from the question of whether this Court should attempt to avoid deciding the constitutional issues, in deference to the three-judge proceedings, it would seem that these issues can and should be deferred for consideration in connection with the findings contemplated by the second clause of § 207(b) (the so-called "180-day findings").

The only constitutional issues which must be faced now are those expressing a challenge to the jurisdiction of this Court to make the findings required by § 207(b).

The findings contemplated by the first sentence of § 207(b), the so-called "120-day" findings, embrace two areas of inquiry (1) whether the Debtor "is reorganizable on an income basis within a reasonable time under section 77 . . . " and (2) "[whether] the public interest would be better served by continuing the present proceedings than by a reorganization under this Act. . . . " The New Haven Trustee contends that this Court lacks power to make findings on either subject because there is no "case or controversy" before the Court; and further argues that making findings with regard to "the public interest" is not a judicial function and cannot be delegated to a court, at least in the absence of adequately defined standards.

### A. *"Case or Controversy"*

■ I have concluded that a finding on the issue of reorganizability may properly be made by an Article III court. The reorganization proceeding itself is the "case or controversy" which justifies judicial action. While there might perhaps be some question as to the validity of legislative intrusion into specific pending litigation by fixing deadlines for decision of particular issues (a question which has not been raised in the present proceeding, and as to which I intimate no view), it is entirely clear that a court may properly comply with such deadlines; its pre-existing jurisdiction would not be impaired.

It is true that the Act does not prescribe procedural machinery for making the required findings in an adversary setting: there is no petitioner or respondent; indeed, the Act does not even mandate a hearing. But there is no requirement that the norms of procedural due process must be disregarded, and they have not been. All parties have been afforded ample opportunity to be heard.

It is also true that the statute provides little or no guidance on the question of the proper allocation of the burden of proof; but that shortcoming is not, in my view, jurisdictional.

In short, there appears to be no valid reason for reaching any conclusion other than the obvious one, namely, that a reorganization court does have jurisdiction to make findings concerning reorganizability of the Debtor.

### B. *Public Interest*

The principal thrust of the New Haven Trustee's jurisdictional argument is that a determination as to whether the public interest would be better served by continuing the § 77 proceeding or by proceeding pursuant to the 1973 Act is essentially legislative in character, and cannot be delegated to an Article III court. The government and other parties counter with the argument that the

---

1. The two cases originally filed in this District are Connecticut General Insurance Corp. et al. v. United States Railway Association et al., Civil Action No. 74–189, and Manufacturers Hanover Trust Co. v. United States Railway Association et al., Civil Action No. 74–332. In both cases, a three-judge court (of which the writer is one member) has been convened, pursuant to 28 U.S.C. § 2284. Documents filed of record in those cases suggest that similar cases pending in other districts are being transferred to this District pursuant to 28 U.S.C. § 1404.

Act itself adequately discloses what Congress intended to define as the public interest, and that all that is required is performance of the normal judicial function of fact-finding.

Unless there is a finding that the Debtor is reorganizable under § 77, there is no necessity for making a public interest comparison under § 207(b). Since I have reached the conclusion that the Debtor is not reorganizable, there is no present necessity for resolving the second phase of the jurisdictional argument.

II. *Definition of "Reorganizable on an Income Basis Within a Reasoanble Time under § 77 of the Bankruptcy Act"*

The parties are not in complete agreement as to whether the standards for determining reorganizability under the Act are different from, or identical to, the standards of § 77. More importantly, there is lack of agreement as to what constitutes a valid plan of reorganization under § 77.

For example, the New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970) recognized as valid a plan of reorganization in which the Debtor would first dispose of its rail operations and then reorganize as a holding company. But when the Penn Central Trustees filed a somewhat similar plan, the ICC purported to hold that it would not constitute a plan of reorganization under § 77. While this ruling does not, of course, represent the final word on the subject, it serves to point up the potential for conflicting views.

■ I find it unnecessary to resolve this doctrinal dispute at the present time. For it is at least clear that in adopting the 1973 Act, Congress was attempting to deal only with the rail assets of railroads in reorganization, and that, for purposes of § 207(b) only a reorganization of those rail assets, pursuant to a plan involving continuation of rail service by the Debtor, would pass muster.

■ Moreover, I am persuaded that reorganizability must be determined on the assumption that the existing regulatory and operational setting will continue. From the very inception of these proceedings, it has been reasonably clear that, if certain conditions could be altered, the Debtor could be made viable. The needed changes—elimination of plant redundancy, reductions in crew consists, full reimbursement for passenger service, improvement in rates and divisions, and, more recently, substantial governmental financial assistance—are not within the control of the Trustees or this Court, and have not been realized.

The issue, then, is whether there is now any reasonable prospect that continuation of the Debtor's rail operations under existing constraints will produce enough net income, soon enough, to support adequately a realistic re-capitalization of the enterprise. Applying the familiar figure of speech, we are concerned with the existence and relative intensity of the light at the end of the tunnel, and also with the length of the tunnel and the further burdens involved in traversing it.

III. FINDINGS OF FACT

1. During the period from the filing of the Debtor's reorganization petition on June 21, 1970, to December 31, 1973, the Debtor's operations have produced losses in ordinary income, calculated in accordance with ICC regulations (49 CFR Part 1201, 501–51) totalling $851.1 million.

2. The Debtor has been able to continue operations during this period only by deferring payments of virtually all real estate taxes, rentals of leased lines, and interest (including mortgage and collateral trust bonds) other than equipment obligations.

3. Non-recurring income aggregating $155.3 million from trustees certificates, sales of real property and equipment, sales of securities, and drawdowns from escrowed funds, have been utilized to sustain operations.

4. The charts below show the ordinary losses; deferrals, and applications of non-recurring income on an annual basis and the detail relating to non-recurring income.

### Summary of Financial Results
(\$ in millions)

| | Ordinary Income (Loss) | Deferred Taxes Leased Line Rents and Interst Oblig.* | Non-Recurring Sources of Cash |
|---|---|---|---|
| June 21 to Dec. 31, 1970 | \$(179.7) | \$142.8 | |
| Year 1971 | (284.5) | 163.9 | \$ 96.6 |
| Year 1972 | (197.9) | 156.1 | 25.0 |
| Year 1973 | (189.0) | 143.1 | 33.7 |
| Total June 21, 1970 to December 31, 1973 | \$(851.1) | \$605.9 | \$155.3 ** |

### Detail of Non-Recurring Sources of Cash

| Sources | 1971 | 1972 | 1973 |
|---|---|---|---|
| Trustees Certificates Drawdown | \$75.0 | \$25.0 | |
| Tenants Tax Escrow Account | 3.1 | | |
| Proceeds from New Haven Property Sale | 9.1 | | |
| Sale of Freight Cars to P & LE | 7.3 | | |
| Mortgage Trustees Drawdown-Selkirk Improvement | 2.1 | | |
| M.B.T.A. Settlement | | | \$ 9.1 |
| Proceeds from Madison Square Garden | | | 2.4 |
| Proceeds from Sale of Contingent Compensation Fund | | | 6.5 |
| "Agnes" Flood Loan | | | 15.7 |
| Total | \$96.6 | \$25.0 | \$33.7 |

5. The aggregate annual expenditures, including all road depreciation accounts, for maintenance of way and structures by the New Haven, New York Central, and Pennsylvania Railroads from 1957 to 1968 and the Debtor's expenditures since the merger, are reflected below:

| | |
|---|---|
| 1957—\$224.75 | 1966—\$179.73 |
| 1958— 176.47 | 1967— 178.54 |
| 1959— 176.55 | 1968— 190.66 |
| 1960— 176.43 | 1969— 190.32 |
| 1961— 163.14 | 1970— 223.82 |
| 1962— 171.47 | 1971— 256.46 |
| 1963— 168.34 | 1972— 244.51 |
| 1964— 171.21 | 1973— 255.9 |
| 1965— 172.47 | |

6. The cost of labor and material utilized in maintenance of way and structures has risen 113% from 1957 to 1973.

7. Expenditures for maintenance of way and structures from 1958 until the merger, and to a lesser extent since the merger, were inadequate to maintain the plant at the level necessary to accommodate traffic.

8. The initial impact of deferral of maintenance of way expenditures was on branch, side, and yard trackage. By the mid-60's, the deferral of maintenance began to have an impact on main line trackage, and since that time the deterioration of portions of the main line has accelerated. Foregoing preventive maintenance has created a situation in which significant refurbishing and replacement of materials is now necessary.

9. In 1970, slow orders had been imposed on 2,100 track miles. By 1974,

---

* Interest on all debt obligations, secured and unsecured, is included in these figures.

** Does not include approximately \$10.7 covered in Order No. 1480 dated March 1, 1974, regarding D.O.T. and certain equipment obligations.

slow orders had been imposed on 8,475 track miles. 6,900 track miles within the system are not in adequate condition to meet the minimum standard imposed by the Federal Rail Administration for operational train speeds of 10 miles per hour. 49 CFR 213 et seq.

10. Assuming normalized maintenance of way expenditures of at least $225 to $250 million per annum, an additional $665 million in present dollars must be expended in an eight-year period to remedy past deferrals.[2]

11. Poor condition of the roadway increases train time, and thereby decreases the service capacity and revenue of the system.

12. In order to provide an estimate of the future financial results of the Debtor's operations, the Trustees' traffic consultants, Temple, Barker & Sloan, developed a forecast of traffic and revenue for 1974 through 1978 (the forecast period).

13. The main assumptions underlying the forecast are as follows:

a. Using 1958 as the base year, the national economy will have an average real rate of growth of 4% per annum during the forecast period.

b. Rail traffic growth in the eastern district will be less than the national rail traffic growth rate. The difference between the eastern district and the national growth rate will be less than in previous years.

c. The Debtor's rail service will be adequate during the forecast period to meet the reasonable expectations of its shippers.

d. The "energy crisis" will improve the competitive position of railroads versus other transportation modes, and improve the Debtor's total tonnage carried and commodity mix.

e. Governmental environmental regulations will be altered to permit utilities and industry to increase their use of coal.

f. Coal traffic will increase 31% from 1973 to 1978, with coal traffic in 1978 comprising 31% of the Debtor's traffic as compared to 28% of the Debtor's traffic in 1973.

g. Higher fuel costs after 1974 will be covered by immediate rate surcharges or increases; or, stated another way, the 1975–78 figures show no incremental cost for fuel and no additional revenue from rate increases to cover that cost.

h. Rate increases adequate to cover increased unit costs (increased costs less saving from higher productivity) will be effective on July 1 of the year succeeding the cost increases.

14. The 1973 estimated actual tonnage for the Debtor was 276.9 million tons. A tonnage increase of 3.68% per year over the 1973 estimated actual tonnage is predicted as follows:

(millions of tons)

| | | |
|------|---|-------|
| 1974 | — | 282.1 |
| 1975 | — | 293.8 |
| 1976 | — | 305.3 |
| 1977 | — | 316.0 |
| 1978 | — | 327.9 |

15. In accord with the method set out below, the traffic forecast was utilized to generate a net revenue forecast in current dollars.

2. This figure is derived from Mr. Jackman's affidavit (Document No. 7243) in which he estimated an 11,000-route mile system would require $451 million ($41,000 per route mile) and the 15,000-route mile system would require $567 million ($37,466 per route mile) to cure past deferrals. A per-route mile cost of $35,000 is applied to an assumed 19,000-route mile system to generate the estimate of $665 million to cure deferred maintenance throughout the system.

a. Unit revenues derived from a model based on 1972 data with certain adjustments to reflect 1973 data were applied to the projected tonnage in each commodity category to generate estimated gross revenue in 1972 dollars.

b. Gross revenue was adjusted to a net revenue figure by application of a .047 factor to reflect revenues received for services rendered by others.

c. Net revenues in 1972 dollars were then converted into current dollars for the forecast period by determining the increase cost due to inflation as offset by productivity increases. Revenue was then adjusted in accord with the rate increases assumptions indicated in Finding 13(h).

d. No reduction in tonnage was made to reflect possible shipper reaction to rate increases.

16. Revenue in current dollars is forecasted to be:

(in millions)

| | | |
|------|---|---------|
| 1974 | — | 1,879.2 |
| 1975 | — | 2,069.4 |
| 1976 | — | 2,258.2 |
| 1977 | — | 2,435.5 |
| 1978 | — | 2,637.3 |

17. Fifty-five percent of the increased revenue is attributable to rate increases and 45% to increased traffic, changes in commodity mix, and changes in unit revenue.

18. Below is the forecasted income statement for the Debtor premised on the traffic and revenue forecast with certain assumptions for cost increases.

(dollars in millions)

| | 1974 | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| Operating Revenues | | | | | |
| Freight | $1,879.2 | $2,069.3 | $2,258.2 | $2,435.5 | $2,637.3 |
| All other | 289.3 | 303.9 | 322.0 | 340.0 | 360.0 |
| Total | 2,168.5 | 2,373.2 | 2,580.2 | 2,775.5 | 2,997.3 |
| Operating Costs | 2,309.7 | 2,491.6 | 2,651.6 | 2,815.7 | 3,001.7 |
| Net Rwy. Oper. Inc. | (141.2) | (118.4) | (71.4) | (40.2) | (4.4) |
| Other Income | 62.2 | 74.2 | 82.0 | 88.5 | 90.4 |
| Misc. Deductions | 21.2 | 20.2 | 20.2 | 20.2 | 20.2 |
| Inc. Avail for Fx. Chgs | (100.2) | (64.4) | (9.6) | 28.1 | 65.8 |
| Fixed Charges | 137.5 | 131.9 | 126.4 | 124.1 | 122.0 |
| Ordinary Income | $ (237.7) | $ (196.3) | $ (136.0) | $ (96.0) | $ (56.2) |
| Average Number of Employees | 79,325 | 79,325 | 79,325 | 79,325 | 79,325 |
| Tons handled (Mil.) | 282.1 | 293.8 | 305.3 | 316.0 | 327.9 |
| Operating Ratio (%) | 82.99 | 81.16 | 79.49 | 78.51 | 77.45 |

19. The ordinary income loss for 1976, '77 and '78 as shown in Finding 18 is overstated because the revenue projections therein utilized did not reflect rate increases to cover increased fuel cost in 1977–78, whereas the operating cost projections do contain increased fuel costs. The substantial increment in the "Other Income" account shown in Finding 18 is attributable to yearly increases in the proceeds of property sales ($6.7 million in 1974 compared with $30 million in 1978).

20. The chart below shows the projected cash position resulting from operations consistent with the income statement shown in Finding 18.

Source and Application of Funds
(dollars in millions)

| Source | 1974 | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| Ordinary income (Loss) | $ (237.7) | $ (196.3) | $ (136.0) | $ ( 96.0) | $ ( 56.2) |
| Adjustments to Earnings: | | | | | |
| Taxes—Accrued | 58.5 | 60.5 | 62.5 | 64.4 | 66.8 |
| —Paid | (.4) | (.4) | (.4) | (.4) | (.4) |
| Interest—Accrued | 108.3 | 102.8 | 97.4 | 95.1 | 93.0 |
| —Paid | (23.0) | (23.9) | (18.4) | (16.1) | (14.1) |
| L.L. Rts.—Accrued | 29.0 | 28.9 | 28.9 | 28.9 | 28.9 |
| —Paid | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) |
| Depreciation | 85.1 | 83.3 | 81.3 | 79.3 | 77.4 |
| Other | (12.) | (20.0) | (26.1) | (30.7) | (30.7) |
| Total Adjustments | 244.5 | 230.2 | 224.2 | 219.5 | 219.9 |
| Cash from Operations | 6.8 | 33.9 | 88.2 | 123.5 | 163.7 |
| Other Sources: | | | | | |
| Proceeds from Sale of Salvage | 15.1 | 16.2 | 17.3 | 18.5 | 19.8 |
| Total Sources | 21.9 | 50.1 | 105.5 | 142.0 | 183.5 |
| **Application** | | | | | |
| Capital Program—Equip. | 5.0 | 11.7 | 12.4 | 13.2 | 14.0 |
| —Road | 20.0 | 30.0 | 31.9 | 33.8 | 35.9 |
| Debt Retirement | 39.1 | 42.3 | 87.4 | 35.0 | 33.6 |
| Amtrak | 6.0 | — | — | — | — |
| Total Application | 70.1 | 84.0 | 131.7 | 82.0 | 83.5 |
| Net Incr. (Decr.) in Cash | (48.2) | (33.9) | (26.2) | 60.0 | 100.0 |
| Beginning Cash | 40.2 | (8.0) | (41.9) | (68.1) | (8.1) |
| Ending Cash | (8.0) | (41.9) | (68.1) | (8.1) | 91.9 |
| Emp. Withheld Taxes Incl. Above | 9.0 | 9.5 | 10.0 | 10.5 | 11.0 |
| Ending Cash Avail for Oper. | $ (17.0) | $ (51.4) | $ (78.1) | $ ( 18.6) | $ 80.9 |

21. The cash forecast for 1974 is as follows:

($ in millions)

| | Month Ending Cash Balance Available for Operations [3] |
|---|---|
| March 1974 | $ (8.8) |
| April | (4.7) |
| May | (2.0) |
| June | (4.9) |
| July | (5.4) |
| August | (28.4) |
| September | (19.4) |
| October | (22.8) |
| November | (25.8) |
| December | (17.0) |

NOTE:
1. Assumes SEPTA payments in April, August and December of $4 million each.
2. Assumes increase AMTRACK reimbursement of $1.3 million per month commencing May 1974.
3. Cash balances reflect approximately $10.-7 million in equipment obligations assumed by the D.O.T.
4. Does not include effect of recent F.R.A. order regarding maintenance standards.

22. The revenue forecast and projections derived therefrom are overstated because of the assumption that the Debtor will be able to provide adequate service to its shippers. Findings 8–13 indicate that the physical condition of

3. By affidavit dated April 26, 1974 (Document No. 7446), the cash balances through August were revised as follows: April—$(17.6); May—$(14.2); June—$(5.6); July—$(15.9); and August—$(38.9).

the system is not such that the service level will meet the reasonable expectations of shippers. It is estimated that the inability to provide service levels satisfactory to shippers will cause a shortfall in the revenue forecast of 2 to 3% per annum or $25 to $50 million per year.

23. During the 1974–78 period, $310.7 million in local taxes, $137.1 million in bond interest, and $140 million in leased line rents will accrue, but not be paid.

24. In order to depict the financial results of the Debtor's rail operations only, the income statement shown in Finding 18 was adjusted as follows:

a. Non-rail income, including accruals of tax allocation payments due from related companies, is extracted from the statement.

b. Due to the lack of definitive information, an arbitrary allocation of 50% of the leased line rents and interest obligations (components of fixed charges) have been extracted from the statement.

c. Tax accruals have been adjusted according to a preliminary analysis developed by the Trustees' staff of the tax consequences of severance of rail and non-rail operations.

d. The rail operation is presumed to carry the full cost of overhead.

25. Set out below is the forecasted income statement based on the procedure set out in Finding 24 for the Debtor's rail operations only.

| | 1974 | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| Operating Revenues | | | | | |
| Freight | $1,879.2 | $2,069.3 | $2,258.2 | $2,435.5 | $2,637.3 |
| All Other | 289.3 | 303.9 | 322.0 | 340.0 | 360.0 |
| Total | 2,168.5 | 2,373.2 | 2,580.2 | 2,775.5 | 2,997.3 |
| Operating Costs | 2,314.3 | 2,496.1 | 2,656.1 | 2,820.1 | 3,006.0 |
| Net Rwy. Oper. Inc. | (145.8) | (122.9) | (75.9) | (44.6) | (8.7) |
| Other Income | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 |
| Misc. Deductions | 13.0 | 10.9 | 10.9 | 10.9 | 10.9 |
| Inc. Avail for Fx. Chgs. | (153.2) | (128.2) | (81.2) | (49.9) | (14.0) |
| Fixed Charges | 83.5 | 78.2 | 72.7 | 70.4 | 68.3 |
| Ordinary Income | $ (236.7) | $ (206.4) | $ (153.9) | $ (120.3) | $ (82.3) |
| Average Number of Employees | 79,325 | 79,325 | 79,325 | 79,325 | 79,325 |
| Tons Handled (Millions) | 282.1 | 293.8 | 305.3 | 316.0 | 327.9 |
| Operating Ratio (Percent) | 82.99 | 81.16 | 79.49 | 78.51 | 77.45 |

26. The chart below shows the projected cash position resulting from rail only operations consistent with the income statement shown in Finding 18.

Source and Application of Funds
(dollars in millions)

| SOURCE | 1974 | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| Ordinary Income (Loss) | $ (236.7) | $ (206.4) | $ (153.9) | $ (120.3) | $ (82.3) |
| Adjustments to Earnings: | | | | | |
| Taxes—Accrued | 51.7 | 53.6 | 55.6 | 57.4 | 59.7 |
| —Paid | (.4) | (.4) | (.4) | (.4) | (.4) |
| Interest—Accrued | 68.9 | 63.6 | 58.2 | 55.9 | 53.8 |
| —Paid | (23.0) | (23.9) | (18.4) | (16.1) | (14.1) |
| L.L. Rts.—Accrued | 14.5 | 14.5 | 14.5 | 14.5 | 14.5 |
| —Paid | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) |
| Depreciation | 83.7 | 81.9 | 79.9 | 77.9 | 76.0 |
| Other | (1.2) | — | — | — | — |
| Total Adjustments | 193.2 | 188.3 | 188.4 | 188.2 | 188.5 |

### Source and Application of Funds
(dollars in millions)

| SOURCE—Continued | 1974 | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| Cash from Operations | (43.5) | (18.1) | 34.5 | 67.9 | 106.2 |
| Other Sources: | | | | | |
| Proceeds from Sale of Salvage | 15.1 | 16.2 | 17.3 | 18.5 | 19.8 |
| Total Sources | (28.4) | (1.9) | 51.8 | 86.4 | 126.0 |
| | | | | | |
| APPLICATION | | | | | |
| Capital Program—Equip. | 5.0 | 11.7 | 12.4 | 13.2 | 14.0 |
| —Road | 20.0 | 30.0 | 31.9 | 33.8 | 35.9 |
| Debt Retirement | 39.1 | 42.3 | 87.4 | 35.0 | 33.6 |
| Amtrak | 6.0 | – | – | – | – |
| Total Application | 70.1 | 84.0 | 131.7 | 82.0 | 83.5 |
| Net Incr. (Decr.) in Cash | (98.5) | (85.9) | (79.9) | 4.4 | 42.5 |
| Beginning Cash | 40.2 | (58.3) | (144.2) | (224.1) | (219.7) |
| Ending Cash | (58.3) | (144.2) | (224.1) | (219.7) | (177.2) |
| Emp. Withheld Taxes Incl. Above | 9.0 | 9.5 | 10.0 | 10.5 | 11.0 |
| Ending Cash Avail. for Oper. | $ (67.3) | $ (153.7) | $ (234.1) | $ (230.2) | $ (188.2) |

———◆———

27. The forecast shown in Findings 18, 25 and 26 do not reflect the costs of eliminating deferred maintenance. See Finding 10.

28. For over two years the Trustees have been analyzing the effect of reducing the system from its present 19,000–plus route miles to either 15,000 or 11,000 route miles.

29. The Trustees' engineering consultants, Wyer, Dick & Company, prepared extensive studies of traffic movements and costs in 1972 to develop a computer model to assist in ascertaining the traffic that would be retained if the system were reduced to a 15,000 or 11,000–route mile operation. The forecasted results of operating the 15,000–mile or 11,000–mile core are derived from the following premises:

a. The productivity of labor, except train and engine crews, will increase at a compound annual rate of 3% for the 15,000–mile core and 5% for the 11,000–mile core.

b. The respective core systems were implemented on January 1, 1974.

c. Fifty percent of the employees made excess by the reduction of the system would elect to take lump sum severance, and the remaining job slots would be eliminated by attrition.

d. The core railroad would be exclusively freight.

30. The chart below compares the projected tonnage, freight revenue, and net railway operating income for the present system, the 15,000–mile and 11,000–mile cores.

| | Tonnage | | | Net Revenue | | |
|---|---|---|---|---|---|---|
| Year | Full System | 15,000 Mile | 11,000 Mile | Full System | 15,000 Mile | 11,000 Mile |
| | | (millions of tons) | | | (millions of dollars-current) | |
| 1974 | 282.1 | 271.5 | 236.0 | $1,879.2 | $1,813.5 | $1,591.7 |
| 1975 | 293.8 | 283.2 | 245.9 | 2,069.4 | 2,000.9 | 1,755.1 |
| 1976 | 305.3 | 294.0 | 255.6 | 2,258.2 | 2,182.3 | 1,919.3 |
| 1977 | 316.0 | 304.3 | 265.1 | 2,435.5 | 2,353.7 | 2,074.1 |
| 1978 | 327.9 | 316.7 | 275.2 | 2,637.3 | 2,558.9 | 2,247.2 |

| *Net Railway Operating Income* | | | |
|---|---|---|---|
| Year | Full System | 15,000 Mile [4] | 11,000 Mile [4] |
| 1974 | (141.2) | (85.8) | (117.1) |
| 1975 | (118.4) | (23.5) | 44.4 |
| 1976 | (71.4) | 39.8 | 104.9 |
| 1977 | (40.2) | 72.8 | 156.4 |
| 1978 | (4.4) | 102.8 | 171. |

### IV. *Conclusion*

As the foregoing detailed findings disclose, there is no prospect that, in the absence of fundamental changes which the Trustees are precluded from bringing about, the Debtor can be reorganized as an operating railroad. Even if the optimal configuration could be achieved, it appears unlikely that the Trustees could obtain the resources to sustain operations in the interim, or that the final result would make it possible to provide for interim administration expenses and support a recapitalization on a fair and equitable basis.

I therefore conclude, in accordance with the views expressed by every participant in the hearings, that the Debtor is not reorganizable on an income basis within a reasonable time under § 77 of the Bankruptcy Act, within the meaning of § 207(b) of the Regional Rail Reorganization Act of 1973.

### ORDER NO. 1543

And now, to wit, this 2 Day of May, 1974, it is ordered, and this Court finds and concludes, that the Debtor, Penn Central Transportation Company, is not reorganizable on an income basis within a reasonable time under § 77 of the Bankruptcy Act (11 U.S.C. § 205), within the meaning of § 207(b) of the Regional Rail Reorganization Act of 1973.

4. These figures were derived by subtracting from the projected income statements (Sharfman affidavit-Document No. 7242) all costs of catch-up maintenance of way and equipment. By doing this the N.R.O.I. projection for the full system and the 15,000 and 11,000-mile systems are comparable. However, all the projections are overstated because the revenue forecast assumed the Debtor's ability to render service equal to reasonable expectations of shippers. The condition of the plant, absent vast investment, is not such that reasonable service levels can be sustained. An alternate approach would have been to include the costs of catch-up maintenance in the full system figures. This would have increased the losses substantially. However, there was no basis in the record for accurately computing the yearly cost of a comparable catch-up program for the full system. *See* Finding 10.