**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**
**In re INTERIM FINANCING OF OPERATIONS.**
**No. 70–347.**

United States District Court,
E. D. Pennsylvania.
May 16, 1975.

James E. Howard, Paul R. Duke, Philadelphia, Pa., and Covington & Burling by Charles A. Horsky, Washington, D. C., for the trustees, PCTC.

Sullivan & Worcester by Morris Raker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford RR Co.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, Philadelphia, Pa., for institutional investors and indenture trustees.

Dilworth, Paxson, Kalish & Levy by Richard L. Bazelon, Philadelphia, Pa., for Irving Trust Co., as corporate trustee.

Rosenman, Colin, Kaye, Petschek, Freund & Emil by William W. Golub, New York City, for groups of equipment investors for whom First National City Bank is agent.

Shearman & Sterling by David L. Bleich, New York City, and Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of N. Y.

Jerome E. Sharfman, Washington, D. C., for U. S. Dept. of Trans.

James F. Dausch, Dept. of Justice, for the U. S.

## MEMORANDUM IN SUPPORT OF ORDER NO. 1884.

FULLAM, District Judge.

This proceeding arises out of an impasse in negotiations between the Federal Rail Administration (FRA) and the Trustees of the Penn Central Transportation Company concerning the character of the obligation which the Trustees should undertake in consideration for receipt of certain financial assistance under the Regional Rail Reorganization Act of 1973 (RRRA).[1] As a means of resolving the impasse, the United States has taken the extraordinary step of asking this Court to order the Trustees to execute an assistance agreement in the form tendered by the FRA.[2] Presumably, this petition is addressed to the Court's general supervisory power over the Trustees and the estate under § 77c(a)(2).

## I. BACKGROUND

A brief review of pertinent highlights of the reorganization proceeding to date points up the issues now before the Court.[3]

It was early recognized that Penn Central's problems were deeper than those traditionally encountered in railroad reorganizations. In addition to deferring payment of interest and principal on outstanding bonds, the basic medicine of § 77, it was necessary in this case to defer as administration expenses state and local tax payments and rents due companies who have leased their rail properties to the Debtor. But even these measures proved inadequate, since the cost of material and supplies, wages, and the debt service on equipment have exceeded revenues. Thus, through the end of 1973 another $153.3 million in cash, generated by borrowings on Government-guaranteed trustees' certificates and from other sources, was required in order to keep the railroad running.

It was necessary to continue to pay debt service on equipment because of § 77(j) of the Bankruptcy Act, which provides in part:

"The title of any owner, whether as trustee or otherwise, to rolling-stock equipment leased or conditionally sold to the debtor, and any right of such owner to take possession of such property in compliance with the provisions of any such lease or conditional sale contract, shall not be affected by the provisions of this section [§ 77]."

Since defaults on equipment obligations would have risked repossession of the equipment and the consequent diminution in the service capacity of the Debtor, the Trustees in the early months of the case affirmed, under § 77(b), almost all equipment obligations. Continued payment of the debt service on equipment is essential if the Debtor is to continue to provide rail services to the public. As will be discussed in detail below, the financing of this debt service is the principal issue in the present controversy.

By early 1973, it became apparent that the prospects for rehabilitation of most of the bankrupt Northeast railroads through the procedures of § 77 as it then existed were bleak, to say the least. In response, the Congress devised the RRRA as a solution to the problems of Penn Central and other bankrupt carriers in the Northeast.[4] The RRRA supplements § 77 by providing for the creation of a new operating company, Conrail, which is to take over ownership and operation of those portions of the

---

1. 45 U.S.C. § 701 et seq.

2. The Secretary of the Department of Transportation has delegated a number of his statutory functions under the RRRA to the Federal Railroad Administrator.

3. For a more detailed history, see, e. g., In re Penn Central Trans. Co., 382 F.Supp. 856

(E.D.Pa.1974); In re Penn Central Trans. Co., 382 F.Supp. 831 (E.D.Pa.1974).

4. The Ann Arbor, Central of New Jersey, Erie-Lackawanna, Lehigh and Hudson, Lehigh Valley, Reading and 15 Secondary Debtors in the Penn Central proceeding are subject to processes of the RRRA.

rail properties to be designated by the United States Railway Association (USRA), the planning agency created by the Act. USRA may also designate rail properties of the bankrupts for acquisition by other solvent railroads. Thus, the RRRA envisions a regional solution to the Northeast railroad crisis.

Particularly relevant to the instant petition are §§ 213 and 215 of the Act, which provided for financing during the period from the enactment of the RRRA to the conveyance to Conrail.[5] In essence, § 213 provided for grants to Penn Central and the other bankrupts to insure that these carriers were not forced to terminate rail operations for lack of cash. Section 215, on the other hand, provided funds to upgrade the rail properties which were to be conveyed to Conrail.

Although initial judicial reaction to the RRRA was rather negative (this Court found the Act did not provide a fair and equitable process, In re Penn Central Trans. Co., 382 F.Supp. 856 (E.D.Pa.1974), and a three-judge court held portions of the Act unconstitutional, Connecticut General Ins. Corp., 383 F.Supp. 510 (E.D.Pa.1974)), the Special Court concluded that the Act was fair and equitable, In re Penn Central Trans. Co., 384 F.Supp. 895 (Sp.Ct.1974), and the Supreme Court held that the Act was constitutional, Regional Rail Reorganization Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The ultimate issue separating the courts was whether there was available to the bankrupts a Tucker Act cause of action to satisfy any unconstitutional taking of their property resulting from the RRRA. Two potential forms of taking were considered by the courts: (1) an interim

erosion taking arising from losses sustained because of the required continuation of rail operations until conveyance of the bankrupts' rail properties to Conrail; and (2) the conveyance taking which would result if the value of the securities issued by Conrail in exchange for the bankrupts' property was less than the value of the property conveyed to Conrail. The Supreme Court held that if either an interim erosion taking or conveyance taking occurred, a Tucker Act judgment would be available, and would provide an adequate remedy.

When the RRRA was enacted it was generally recognized, and soon became universally recognized, that the cash required by the Debtor and other carriers in reorganization to sustain operations until the conveyance to Conrail would exceed the amounts authorized by the RRRA. Congress responded by amending the RRRA on February 28, 1975, to increase the funds authorized under §§ 213 and 215.[6] In addition, as will be discussed below, the function of § 215 was dramatically reformulated.

Improvements to all rail properties, irrespective of inclusion in the Final System Plan, are now eligible for § 215 funding; and by the addition of the language "program maintenance" the Act now clearly permits funding for most, if not all, of the maintenance to rail facilities and equipment which the Debtor ordinarily performs.[7] The latter clarification was necessitated by the construction of the original version of § 215, adhered to by some, that only maintenance expenditures which resulted in an improvement to the rail facilities were eligible. Finally, a new subsection, § 215(a)(3), has been added which au-

---

5. Under the original version of the RRRA, the minimum interim period was approximately 680 days. P.L. 93–488 amended the Act to increase this period by 120 days to 800 days. Thus, for the purposes of this petition a conveyance date of March 1976 has been assumed.

6. $197 million was added to the original $85 million in § 213 funds and $150 million was

added to the original $150 million in § 215 funds. Another feature of the 1975 amendments was to permit inclusion of the Erie-Lackawanna, which had previously elected to reject the Act's procedures.

7. See Hearing Before the Surface Transportation Subcommittee of the Senate Commerce Committee, on S. 281, 94th Cong., 1st Sess., Serial No. 94–1 at 12 (Senate hearings).

thorizes the Secretary of DOT, with USRA approval, to guarantee funds

"to acquire rail properties for lease or loan to any such railroads until the date such rail properties are conveyed under this Act, and subsequently for conveyance pursuant to the final system plan, or to acquire interests in such rail properties owned by or leased to any such railroads or in purchase money obligations therefor."

Immediately upon the enactment of the February amendment, continuing a process which had begun in late 1974, the Trustees and the FRA undertook a joint effort to determine the amount of cash necessary to support Penn Central's rail operations through March of 1976, the expected date of Conrail's takeover, and to devise a plan for utilization of §§ 213 and 215 funds for that purpose. To date, $57.5 million in § 213 funds authorized by the amendments have been received and expended by the Debtor. In addition, the FRA has proposed the following general program to satisfy Penn Central's cash needs through March of 1976:

(a) Purchase of new rail and ties previously ordered by the Debtor—$40.7 million;

(b) Installation of new track and ties, including the cost of other track material required for such installation—$37.3 million;

(c) Installation of rewelded rail—$5.4 million;

(d) Payment of installment of principal and/or interest due on equipment obligations beginning May 1, 1975—$52.6 million; and

(e) Section 213 grant assistance, if appropriate, to be deposited during the year as required.

The Trustees and the FRA agree that arrangements covering the matters specified in Paragraphs (a) through (c) above should be consummated. Moreover, the Trustees have proposed additional § 215 projects: $125 million for equipment maintenance scheduled to be performed at the Altoona, Pennsylvania shop facilities; program maintenance projects, including surfacing, installation of secondhand fit rail and ballast, and equipment maintenance performed at locations other than Altoona.[8] The FRA has at least the Altoona program under active consideration. The impasse which has precipitated the Government's petition stems from the Trustees' reluctance to enter into an agreement under § 215(a)(3) covering equipment obligations coming due after May 1, 1975. Complicating the matter is the position of the FRA that if equipment obligation financing is not implemented, it will be necessary to re-evaluate the entire funding package.[9]

In short, the Trustees urge funding for program maintenance and improvements, but object to funding by the payment of equipment debt, while the Government, reluctant to fund more projects of program maintenance and improvements, urges equipment financing as the method of choice. The principal justification asserted by the Government is the need to avoid the "double payment" problem.

As originally enacted, § 215 was designed to insure that Conrail would not later be required to pay the bankrupt carriers for increases in the value of

8. The record indicates that dollar estimates of the cost of the program maintenance and equipment maintenance proposals were submitted to the FRA; however, these estimates are not in the record.

9. Paragraph 8 of the Government's petition (Document No. 8761) stated that there would not be further § 213 or § 215 funding unless the proposed agreement was executed by the Trustees. At the hearing on the Government's petition, Asaph H. Hall, Deputy Administrator of the FRA, refined the FRA's position to that stated in the text (Tr. 14,160).

their property attributable to the investment of public funds under § 215.[10] Somewhat similar safeguards have been carried forward in amended § 215 [11] with respect to projects funded under § 215 (a)(1) and (a)(2). In fact, the amended statute appears to nail down this point in three ways: § 215(b)(1) provides that where value is to be determined on the basis of the physical condition of property, the physical condition on the date of the particular financial assistance agreement shall be used; § 213(a) incorporates similar provisions with respect to all funds used for program maintenance, and § 303(c)(1)(C) contains somewhat similar protection with respect to properties conveyed to other solvent carriers, rather than Conrail.

No such protective provisions are expressly set forth in the statute with regard to projects funded under § 215(b) (3), presumably because such projects do not involve improvements to properties now owned by the bankrupt railroads, but rather the present acquisition of interests therein.

The proposal now before the Court is made under the authorization of that part of § 215(a)(3) relating to the acquisition by FRA of "interests in . . . purchase money obligations [for rail properties owned by or leased to any such railroads]." The proposal is rather intricate. The kind of "interest" in equipment obligations which the FRA would acquire would not be outright ownership, but a subordinated right to exercise, by subrogation, the rights of ownership, with respect to that portion of the equipment obligation represented by installments falling due between May 1, 1975 and March 31, 1976.

Ordinarily, the Trustees pay current installments on equipment obligations out of operating revenues. Under the Government's proposal, the FRA would provide the Trustees with § 215 funds for the express purpose of meeting such installments as they fell due (approximately $1.8 million during the month of May are actually involved in the present case, but it is intended that the same procedure would be followed with respect to a total of approximately $52.6 million in such installments, falling due between May 1, 1975 and March 31, 1976). The Trustees would make the installment payments, but the underlying debt would not thereby be extinguished. Instead, FRA would thereby acquire from the present holders of the obligations a *pro tanto* assignment of their rights against the Debtor. But the FRA would agree not to enforce its rights against the Debtor until the conveyance to Conrail or someone else, or until an earlier default. Interest would not run in the interim.

Thus, in effect, the FRA would be making an interest-free loan to the Debtor for the purpose of meeting current installments, a loan which would be due and payable at the time of the conveyance pursuant to the Final System Plan. The net result would be that, in order to free up current revenues to meet other operating expenses, the equipment obligations would be deferred until conveyance pursuant to the Final System Plan. All parties have proceeded on the assumption that such deferrals would rank as administration claims.

It is clear, of course, that this proposal would avoid the possibility of "double payment" to the estate. Indeed, if the value of the Debtor's equity in the equip-

---

10. Section 215 as originally enacted provided in pertinent part:

"The Corporation (Conrail) shall not be required . . . to compensate any railroad . . . for that portion of the value of rail properties transferred to it under the Act which is attributable to the acquisition, maintenance, or improvement of such properties under this section."

11. Pertinent discussions may be found at pp. 22–23, 35–37, 43, 45, and 47–48 of the Senate Hearings and pp. 17, 29, 44, 97, 148–49, and 156–58 of the House Hearings. Hearings Before the Committee on Interstate and Foreign Commerce, on H.R. 2051 and S. 281, 94th Cong., 1st Sess., Serial No. 2. 94–1 (House Hearings).

ment were increased dollar for dollar with each installment payment, the present proposal would do no more than guard against such double payment. In fact, however, it goes much further, because the increase in the Debtor's equity represents only a very small portion of each installment payment.

The payment of installments on equipment obligations has three distinct consequences. The accrued interest obligation is satisfied, the cost of use of the equipment, depreciation, is paid for, and the Debtor's equity is increased. Accepting for purposes of illustration the estimates made by the parties, in most cases after all of the installment payments have been made, the equipment is usually worth about 15% of its original cost. On the average, then, a dollar paid by the Debtor to satisfy a given installment payment results in about 15 cents in residual value. Stated otherwise, roughly 85% of every installment payment represents interest and depreciation costs associated with the current use of the equipment, and is undoubtedly an expense of current operations. To avoid double payment, all that would be required would be to credit Conrail for the portion of the residual value attributable to payments made with funds supplied by FRA.[12]

Thus, implementation of § 215(a)(3) as proposed by the FRA in the present case would work a substantial change in the *status quo*, by creating a new kind of deferral of administration expense. Until now, the basic administration claim deferrals (*i. e.*, apart from interest on funded debt) have been limited to state and local taxes, and rents due lessor companies. And the magnitude of these new deferrals would be impressive,

aggregating some $52.6 million through March of 1976.

It is appropriate to note at this point that FRA's proposed financing package, and specifically its position that equipment financing should be an integral and major part of any Government financing to Penn Central, reflects a judgment which has been formulated as part of the FRA's larger responsibility to administer §§ 213 and 215 in a manner designed to insure the continuation of rail services provided by all carriers subject to the processes of the RRRA. In allocating §§ 213 and 215 funds the FRA must deal with constraints somewhat beyond its control. For instance, if the Penn Central, by far the largest carrier of the group, were to consume all of the remaining § 213 funds, then cash shortfalls of the other bankrupts could be met only with § 215 funds. However, the number of eligible § 215 projects on rail properties of the other bankrupts may be somewhat limited.[13] In the case of Penn Central, there does not appear to be any similar problem with regard to the type of § 215 funding that can be made available by the FRA.

In sum, between April 1975 and March 1976, the Debtor's revenue will be $270.6 million short of basic operating expenses —wages, material and supplies, and equipment obligations. Three potential forms of assistance are available under the RRRA: § 213 provides outright grants; § 215(a)(1) and (a)(2) provides funds for program maintenance and improvements under conditions which are agreed to by the Trustees; and § 213(a)(3) authorizes, among other things, acquisition of equipment debt, but the terms sought to be imposed by FRA through the proposed agreement

---

12. Presumably, this could be achieved by acquisition of a *pro rata* equity interest in the equipment instead of acquisition of an interest in the equipment obligees' debt. Both methods are specifically authorized by § 215 (a)(3). However, there is some concern that direct acquisition of an equity interest in the

equipment is not feasible because of the after-acquired property clauses contained in the Debtor's bond indentures; and other possible legal hurdles.

13. Testimony of Asaph H. Hall, Deputy Administrator of the FRA (at Tr. 14,168).

are unacceptable to the Trustees in light of the resultant increase in the amount of deferred expenses.

## II.  JURISDICTION, AND ITS PROPER EXERCISE

### A.  *The Role of the Reorganization Court*

In In re Penn Central Trans. Co. (Appeal of Smith), 508 F.2d 270 (3d Cir. 1975), the Court of Appeals held that creditors whose only complaint was that their constitutional rights would be violated by carrying out an order of this Court no longer have standing to appeal on that ground, since the decision of the Supreme Court in the Railroad Reorganization Act Cases, *supra,* gives them a remedy in the Court of Claims under the Tucker Act.  Judge Gibbons' opinion in that case includes the following:

> "Thus it is now clear (1) that Penn Central is a railroad in reorganization under the Regional Rail Reorganization Act of 1973 rather than under § 77 of the Bankruptcy Act, and (2) that to facilitate reorganization, interim operations of the railroad at a loss may constitutionally be continued because the United States will be required to indemnify the creditors and stockholders for interim erosion of the debtor's estate in an action of the Court of Claims . . . ".  508 F.2d 270, at 273.

All parties appear to agree that the suggestion that § 77 no longer has any application to the Debtor's affairs cannot be taken literally, and that the Court of Appeals obviously meant to convey the idea that the Debtor is now being reorganized under § 77 as supplemented and partially superseded by the RRRA; stated otherwise, instead of being reorganized solely on the basis contemplated by § 77, the Debtor is to be reorganized pursuant to § 77 by transferring part of its rail properties to Conrail pursuant to the RRRA, and receiving therefor the compensation specified by the Special Court (augmented, as appropriate, by a Tucker Act recovery in the Court of Claims).

▮  Quite apparently, this Court must retain its § 77 jurisdiction in all respects until there is a Final System Plan, and with respect to the properties (both rail and non-rail) not included in the Final System Plan, and for the purpose of reorganization around the assets which will remain after the conveyances ordered by the Special Court.[14]  Although it has been suggested that future events may point to the advisability of converting the § 77 proceeding into some other form of reorganization under the bankruptcy laws, until that happens the § 77 proceedings must be continued.  Indeed, the Supreme Court was able to avoid addressing one aspect of the uniformity issue by noting that the § 77 proceedings have not been dismissed.  And finally, it should be pointed out that although the RRRA gives to the Special Court all of the powers of a reorganization court, the Special Court's jurisdiction is limited to "all judicial proceed-

14.  The Supreme Court addressed this precise point:

"[N]either the Rail Act [RRRA] itself nor the procedures thereunder finally determine the interests of the respective creditors. Those will be decided in the § 77 reorganization courts which will distribute to creditors the consideration received for the rail properties."  Railroad Reorganization Cases, 419 U.S. 102, 154, 95 S.Ct. 335, 364, 42 L.Ed.2d 320 (1974).

The Court also observed:

"Congress concluded that solution for the [northeast railroad] crisis required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation. Since such a system cannot be created under § 77 rail reorganization law, and since significant federal financing would be necessary to make such a plan workable, Congress supplemented § 77 with the [RRRA]."  95 S.Ct. at 342.

And again,

"The Rail Act [RRRA] like § 77 of the Bankruptcy Act, *which the Rail Act supplements,* merely advances another step in the direction of liberalizing the law on the subject of bankruptcies."  95 S.Ct. at 363 (emphasis added).

ings with respect to the final system plan" (§ 209(b)); its appellate authority appears to have been limited to review of the orders entered under § 207 (b). And § 601(b) of the Act provides merely that the provisions of the Interstate Commerce Act and the Bankruptcy Act

" . . . are inapplicable to transactions under this Act to the extent necessary to formulate and implement the final system plan whenever a provision of any such act is inconsistent with this Act."

■ It therefore seems beyond question that this Court must continue to perform the functions contemplated by § 77 of the Bankruptcy Act. But whenever a "transaction" under the RRRA is "necessary to formulate and implement the final system plan," any inconsistent requirements of the Bankruptcy Act are to be disregarded.

Throughout the litigation which led to the decisions of the Special Court and the Supreme Court discussed briefly above, a central issue was whether the RRRA represented an exercise of the power of eminent domain, or of the bankruptcy power. Its constitutionality was upheld solely on the ground that it was an exercise of the bankruptcy power which might, but was not intended to, result in an uncompensated taking for public use; and that the Government would have to provide compensation (through the vehicle of a Tucker Act judgment) in the event any such uncompensated taking should occur.

Having succeeded in vindicating the constitutionality of the RRRA as a reorganization statute, but only by conceding the availability of a Tucker Act remedy for any unconstitutional takings which might inadvertently result the Government now appears to be taking the position that the parties to the reorganization proceeding have no rights except an eventual Tucker Act remedy. I believe this would be an unwarranted extension of the Supreme Court's decision.

■ In the first place, it is the availability of proceedings in a federal court, under the control of a judicial officer with equity powers for the protection of the rights of the parties, preservation of the estate, and assurance of evenhanded treatment, which renders constitutional any reorganization proceeding. This does not mean, of course, that the powers of a reorganization court may now be exercised without regard to the RRRA. But neither does it mean that a reorganization court may properly enter unconstitutional orders, and intentionally create or enlarge Tucker Act claims, secure in the knowledge that appeals from such orders are likely to be dismissed.

■ Moreover, there is no conceivable basis for suggesting that the RRRA was intended to absolve the trustees of railroads in reorganization from their fiduciary responsibilities.

■ My views may therefore be summarized as follows: The RRRA, as construed by the Special Court and the Supreme Court, as well as by the Court of Appeals, precludes this Court from attempting to terminate the reorganization proceedings on the ground that a "reasonable time" for reorganization has been exceeded, and also requires this Court to assume that a reorganization which is completed in accordance with, and in the time span contemplated by, the RRRA will be "successful." This Court is also under an obligation not to permit the implementation of the RRRA according to its terms to be frustrated. But within those limitations, it is the continuing obligation of this Court to attempt to insure that the best interests of the estate and the parties to the reorganization are not unnecessarily jeopardized, and to avoid intentional enlargement of eventual Tucker Act claims.

### B. *The Government's Role*

The present dispute points up an unfortunate, but apparently unavoidable, flaw in the statutory scheme of the

RRRA. The aim, obviously, is to keep the railroads running and providing adequate service up until the time those chores are assumed by Conrail or others. To the extent that public funds are to be used to support such interim operations, there should of course be an appropriate degree of public control over the way those funds are expended. But it would seem that, in the nature of things, those exercising such control should have a commensurate degree of responsibility for the result.

The total cost of supporting continued operations during the interim period is to be met from the railroad's own revenues of nearly $2 billion annually, plus Government contributions, in whatever form, in amounts which, while substantial, pale in comparison. Almost daily, the Trustees and management of the railroad are required to make decisions as to courses of action to be followed, which can have direct bearing upon the amount of Government funds which would be required to keep the railroad functioning. Many such decisions should be made in the light of long-range plans. But the planning function has been largely removed from the Trustees and railroad management, while those in charge of the planning have not yet formulated their plans, and are not yet in a position to assume responsibility for interim decisions.

It would seem that the real issue in the present proceeding is not, as the Government would have it, whether the Trustees are to be allowed to terminate rail service if they are dissatisfied with the kinds of Government help being offered, but rather such issues as the level of service to be maintained, the kind of plant which will be available for conveyance to others pursuant to a Final System Plan, and the amount of debt with which Conrail will be saddled before it is formed. To the extent that these questions are answered in ways which require greater or lesser expenditures of money, logic would suggest that the answers should be given by those whose money will be spent. So long as

the Trustees have not been relieved of their operating responsibilities, they cannot be relieved of their responsibilities with respect to the proper application of operating revenues.

■ It is argued on behalf of the Government that this Court should order the Trustees to execute the proposed agreement, because a contrary ruling would improperly interfere with the discretionary authority granted the FRA under the statute. But the statute does not make the FRA or any other representative of the Government interests the exclusive repository of discretionary authority in this area. If that had been the congressional intent, there would have been no need to provide for agreement with trustees of the bankrupt railroads. On the contrary, in my view both the FRA and the trustees must act within their respective spheres of control, with due regard for the limitations and requirements of § 77 of the Bankruptcy Act, as supplemented by the RRRA. What is required is cooperation between parties, some of whose goals are identical, others of whose goals are not necessarily compatible.

### III. THE MERITS

As discussed above, the fundamental issue in this case is whether the trustees of a railroad in reorganization, which has been conclusively found non-reorganizable on an income basis under the normal procedures of § 77 of the Bankruptcy Act, should, and may constitutionally, be required to create additional high priority debt in order to finance loss operations of the railroad during the period in which government planners are at work under the provisions of the RRRA seeking to devise a "Final System Plan" under which some of the Debtor's rail properties will be conveyed for use in rail operations by others, and the Debtor's estate will eventually be relieved of its common carrier responsibilities.

In attempting to resolve this dispute, the Court must take into account three

possible factual situations which may unfold: (1) The procedures of the RRRA will be fully completed, and the result will be so successful that no one will be able to assert a Tucker Act claim for any kind of erosion. (2) The procedures of the RRRA will be fully completed, but will result in one or more forms of uncompensated taking, whereupon the Government will be required to pay a judgment or judgments under the Tucker Act. Or (3) full implementation of the RRRA will be unacceptable to Congress, or for some other reason will prove unfeasible, whereupon some other outcome, not now foreseeable, will occur. In the latter case, too, the Tucker Act would be available if appropriate.

It is not within the province of this Court to predict which of the three alternatives is likely to eventuate. But it is important to recognize that under no circumstances would it serve any legitimate governmental interest to increase the likelihood of resort to the Tucker Act, unless such a course is utterly unavoidable. If there is one concept which emerges with clarity from the legislative history of the RRRA and of the 1975 amendments thereto, it is that Congress does not eagerly embrace the idea of Tucker Act judgments to vindicate the constitutional rights of creditors and others.

The Trustees contend that, if necessary, they could embark upon an "austerity" program which would fulfill the minimum responsibilities imposed by law upon common carriers. By reducing the work force, cutting back on maintenance, and failing to pay recently negotiated wage increases, they suggest, essential services could still be provided. Whether or not continued rail operations would, as a practical matter, be feasible under such a program is an open question. At the very least, it is clear that the properties available for conveyance to Conrail would be in worse condition under such a program than if the cutbacks were not made. Under any view of the matter, the Trustees' proposal is unacceptable, except perhaps as a last resort.

The alternative is for the Trustees to renew their efforts to reach agreement with the FRA on a total financing package. Approximately $83 million of § 215 funding is apparently available now, if the FRA is prepared to release these funds notwithstanding the absence of an executed agreement covering equipment financing. Even with respect to equipment financing, the differences do not appear to be insoluble. As discussed above, it would be a relatively simple matter to structure an agreement for the use of § 213(a)(3) funding under which the obligation to repay would be limited to the amount by which the Debtor's equity in the equipment was increased.

It is true, as the Government contends, that Congress, when considering the 1975 amendments to the statute, was advised that the Department of Transportation planned to use some $62 million of the § 215 funds for equipment obligations. But it is very clear from the legislative history that the precise manner of such use was not discussed. Indeed, the testimony of the only witness on that subject, Deputy Secretary Barnum, can be fairly read as referring only to acquisition of equity interests in the equipment.[15] At best, the distinction between acquiring an equity interest in equipment, and acquiring an interest in equipment debt, was blurred. There is not the slightest indication in the legislative history that Congress contemplated imposing a requirement for the creation of new and major deferrals of operating expenses. If that were the intent of Congress, a substantial question might then arise as to whether the amended statute would necessarily receive the same constitutional imprimatur as the original statute.

■ But it is not necessary to reach those or other possible constitutional is-

---

15. Senate Hearings at p. 12; House Hearings at p. 25.

sues at this time. It is clear that, under any view of the matter, further deferrals of administration expenses should not be permitted unless absolutely necessary. The Government has not demonstrated on this record that such further deferrals are necessary, or that the implementation of the RRRA would in any way be adversely affected by the adoption of other available alternatives. The petition will be denied.