In the Matter of **BOSTON AND MAINE CORPORATION, Debtor.**

The **GROUP OF INSTITUTIONAL BONDHOLDERS, Appellant,**

Robert W. **MESERVE, Trustee of the Property of Boston and Maine Corporation, Debtor, Appellee.**

No. 73–1069.

United States Court of Appeals, First Circuit.

Heard June 5, 1973.

Decided Aug. 23, 1973.

Jerome Preston, Jr., Boston, Mass., with whom Lewis H. Weinstein, Philip Burling, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for appellant.

Robert G. Parks, Boston, Mass., with whom Mulcahy & Mulcahy, and Charles W. Mulcahy, Jr., Boston, Mass., were on brief, for Robert W. Meserve, trustee, appellee.

John L. Davidson, Jr., St. Louis, Mo., with whom Greenfield, Davidson & Mandelstamm, St. Louis, Mo., Richard Ely, Alan L. Lefkowitz, Tom L. Peterson, and Ely, Bartlett, Brown & Proctor, Boston, Mass., were on brief, for Passaconaway Co., intervenor appellee.

John T. Collins, Boston, Mass., with whom Sherburne, Powers & Needham, Robert H. Quinn, Atty. Gen., Com. of Mass., and Mark Furcolo, Asst. Atty. Gen., Boston, Mass., were on brief, for the State of N. H., The Com. of Mass., and Vermont Railway, Inc., intervenors appellees.

Before COFFIN, Chief Judge, Mc-ENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant, called the Group of Institutional Bondholders (Group), consists of insurance companies[1] holding first mortgage bonds of the debtor, the Boston and Maine Corporation (B&M). The Group is now appealing from orders of the reorganization court allowing the trustee of the B&M to make certain capital expenditures. We affirm.

B&M is a medium-sized railroad corporation operating in Massachusetts, Maine, New Hampshire, Vermont and for a short distance in New York. From earlier prosperity, the B&M deteriorated after 1958 into financial distress, operating through the 1960's on the verge of bankruptcy. In early 1970 the B&M had accumulated unpaid property taxes exceeding five million dollars, and bond interest was in arrears; it was placed in reorganization under § 77 of the Bankruptcy Act, 11 U.S.C. § 205, upon petition of the four insurance companies that constituted the appellant Group. Trustees were appointed by the district court in the spring of 1970.

The trustees at first attempted to reopen a merger proposal, rejected in the late 1960's by the B&M's stockholders, that would have joined the B&M with the Norfolk & Western system. The Interstate Commerce Commission (ICC) in 1971 turned down this proposal as "prima facie impracticable." At the same time it rejected the Group's application for abandonment of the B&M's entire line. Later in 1971, at the ICC's request and after they were able to improve the B&M's cash position substantially, the trustees submitted a preliminary reorganization plan. In 1972 twenty-one days of hearings were held on this and alternative plans by an Administrative Law Judge who, early in 1973, issued a report[2] approving, with modifications, the trustees' proposed plan. He rejected the Group's second proposal which, like the first, called for the prompt liquidation of the B&M. He ordered the trustee[3] to submit a "definitive plan for reorganization" by June 30, 1974, and set the hearing on that plan for September 9, 1974.

The trustee's plan requires, to bring about a successful reorganization, the realization of operating economies; provision of maintenance sufficient to keep essential services in operation; sale of unprofitable trackage and real estate, including a sale to Massachusetts of all Boston commuter operations; successful attempts to secure tax abatements; and ultimately recapitalizing a much smaller, but self-sustaining, freight railroad. At the hearing before the Administrative Law Judge proposals from other interested parties indicate the possibility of merger with neighboring lines. Stockholders of the Maine Central, who control the Bangor & Aroostook, a Maine freight line, are seeking control of the B&M and, according to the ICC judge, could play a role in the reorganization and refinancing arrangements. Presumably it was to allow factors such as these to jell, as well as to permit further negotiations with Massachusetts and New Hampshire over the possible sale of parts of the B&M line and operations, that the Administrative Law Judge continued the proceedings until mid-1974.

Against this background the Group, or such as is left of it, appeals from the district court's approval of six

---

1. The Group originally included four insurance companies holding first mortgage bonds in the face amount of $14,198,000, or about 30 percent of the outstanding total. On December 27, 1972, $10.3 million of the bonds were sold by two of the insurance companies to an independent dealer. These bonds were subsequently purchased by Passaconaway Company, now the largest single bondholder. The Group currently represents only slightly more than $4.1 million. Passaconaway has intervened in the proceedings to oppose the Group's position and support the position of the trustee.

2. Report and Order recommended by Victor A. von Rinteln, Administrative Law Judge, ICC Dkt. 26115 (Feb. 13, 1973).

3. By early 1973 two of the original three trustees had resigned, and no new trustees had been appointed.

petitions by the trustee to make certain capital expenditures. All of the expenditures would facilitate continued operation of the railroad. The Group asserts that the capital expenditures, especially those for the repair of the Hoosac Tunnel, are unreasonable, but it relies primarily upon allegations of statutory and constitutional error: it says that under § 77, if creditors oppose expenditures on the ground that there is no reasonable prospect of successful reorganization, and introduce evidence to support that contention, the court must make a finding "as to whether or not the Railroad is probably reorganizable."

We disagree. Section 77 does not contemplate that a court will make, as a matter of course, an unaided judgment on reorganizability before the ICC has considered the matter and certified a plan to the court. It instead provides in detail for a multi-staged effort by the ICC, creditors and court to develop, if feasible, a satisfactory reorganization plan. The ICC is an expert agency invested with "primary responsibility for the development of a suitable plan." Ecker v. Western Pac. R. Corp., 318 U.S. 448, 468, 63 S.Ct. 692, 705, 87 L.Ed. 892 (1942). Section 77 "manifests the intention of Congress to place reorganization under the leadership of the Commission, subject to a degree of participation by the Court." *Id.*

■ Doubtless the court, perhaps even without consulting the Commission, could terminate a reorganization proceeding were it manifestly frivolous or brought in bad faith. That is plainly not the case here. The trustees, the ICC Administrative Law Judge after hearings, and Passaconaway have expressed the belief that the B&M is reorganizable. We have examined the trustee's plan, the Administrative Law Judge's

Recommended Report and Order, and the testimony of the Group's expert. While the trustee and the ICC judge acknowledge that reorganization of the B&M presents unique problems, they think it can be done and describe a variety of factors bearing on the likelihood of success. We cannot say that the prospects of reorganization are so dim that the process established by Congress for developing, refining and considering a plan should be short-circuited by a court's summary attempt to substitute its own premature and likely ill-informed judgment as to reorganizability. Under § 77 the court's plain duty is to defer at this juncture to the ICC.

We do not say that senior creditors must sit by for years while their security evaporates. Section 77(g)[4] permits the reorganization court, on motion of any party or on its own motion, "after hearing and after consideration of the recommendation of the Commission", to dismiss the reorganization proceedings if "there is undue delay in a reasonably expeditious reorganization." The Group did not formally make a motion under § 77(g) but instead sought to raise reorganizability collaterally to its objections to capital expenditures. Even were we charitably to treat its objections as, in effect, a § 77(g) motion, we nevertheless would conclude that the court, under the circumstances presented, did not abuse its discretion in failing to rule specifically on reorganizability and in otherwise denying the motions.

■■ The same delay could be justified in one case but "undue" in another. We would therefore not necessarily limit § 77(g) dismissal to circumstances in which a plan had been certified and approved, although not expeditiously carried out. Were the ICC and other parties to the reorganization to be unduly

---

4. Section 77(g) provides:

If in light of all the existing circumstances there is undue delay in a reasonably expeditious reorganization of the debtor, the judge, in his own discretion, shall, on motion of any party in interest or on his own motion, after hearing and after consideration of the recommendation of the Commission, dismiss the proceedings. Upon the filing of such an order of dismissal, all right, title, or interest of the trustee or trustees shall vest by operation of law in the debtor unless otherwise provided by such order.

lethargic in evolving an initial plan, an injured party might, upon a proper showing, invoke § 77(g). Indeed, we would even agree with appellants that in unusual circumstances a party might be entitled to a preliminary ruling on reorganizability if the party could demonstrate peculiar and major irreparable injury that would make any additional delay "undue." Each case turns on its own facts; the court must consider and weigh the effect of delay on all parties and on the public interest as well.

The Group has failed to demonstrate, with any precision, the extent to which the passage of time is affecting its security. Obviously the B&M's tax and interest liabilities, and other priority indebtedness such as administrative expenses, continue to mount; but while we know in a general way that the claims against the bondholders' security increase with time, the record here does not inform us as to how badly off they are, and will be, and appellant made no serious effort to marshall and present such information in the reorganization court. This information is important, since the greater the bondholders' cushion and the slower the rate at which their security is eroding, the less dire for them the consequences of delay even if attempts at reorganization should ultimately fail.[5]

---

5. Some information on the current prospects of the bondholders is available to this court, but it is of such uncertain and speculative nature that we take little account of it in reaching our decision. It is particularly important that there is no definitive indication of the rate at which the railroad's assets are depreciating and the rate at which priority indebtedness is displacing the bondholders' claims to the available assets. Thus, even though we believe that an adequate cushion exists for the bondholders today, we have no way to tell about tomorrow.

The outstanding principal amount of the first mortgage bonds is $48,090,376. Accrued and unpaid interest, and interest on the unpaid interest, total $12,562,408.47, so that the total indebtedness on the bonds is $60,652,784.47. According to the Administrative Law Judge's Report, p. 35, real estate and other tax claims taking priority over the bonds are currently approximately $14.5 million. No estimate of other claims prior to those of the bondholders is available to us, but in order to fully satisfy all bondholders it is clear that at least $75 million must be available.

Several estimates of the value of the B & M have been made. The Financial and Statistical Statements of the B & M list the total transportation property less depreciation and amortization at $181,464,474. This book value figure, however, bears no necessary relation to the currently realizable value on sale or liquidation. A Coverdale & Colpitts valuation of all B & M properties except land and some buildings put the gross value at $46,000,000 and the net salvage value at $26,700,000. The market value of B & M land has been variously estimated from a high of $182,749,000, assuming that the land is devoted to transportation corridor use and that the Massachusetts Bay Transportation Au-

thority (MBTA) agrees to purchase the Boston area passenger lines, to a low of $106,533,100, which assumes that some land will be sold in small parcels for nontransportation use. The B & M also has a liquidated but unpaid claim of $18,000,000 due from the MBTA for some of its Boston properties. Thus, according to the Administrative Law Judge's Report, the "lowest" value of the railroad, assuming liquidation and salvage of all except the Boston transportation corridors, would be $151,731,487. Higher values can be obtained by assuming that some portions of the railroad would be sold as a going concern for values as high as gross replacement value; these estimates range to $375,188,387.

Even though some of these properties have depreciated since the time the estimates were made, the value of the B & M continues to be substantially in excess of the value needed to satisfy the bondholders. Much of the value is in real estate that, if present trends continue, may appreciate rather than depreciate over time. The Group argues for a rather lower valuation based on immediate liquidation, and asserts that such a sale would bring $89 to $117 million. From this they subtract an erosion of the bondholder's position that adds, to the $14.5 million now due in taxes, an additional depreciation of $11.5 million, sundry losses of $6.0 million, and future erosion of all sorts at approximately $11.2 million per year. (App. 690; 1882–95) Taking the Group's figures at face value, the security available to meet the $75 million in claims is still $71.5 to $99.5 million. [The "additional depreciation" above may be overstated, since based on depreciable property of only $26.7 million. The Group neglects to count as an asset the $18 million claim against the MBTA. In addition, the "erosion" figures failed to account for possible

**374**

■ Further, the Group has not demonstrated that the alternative plan it proposes—the expeditious liquidation of the B&M's assets—would necessarily be desirable, particularly for the unsecured creditors who are also entitled to protection of their assets. Canada Southern R. Co. v. Gebhard, 109 U.S. 527, 536, 33 S.Ct. 363, 27 L.Ed. 1020 (1883). *Cf.* Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 597, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). The ICC judge is of the opinion that summary liquidation would have adverse consequences for the bankrupt's estate. Even if it were shown that a distress sale would be best for secured creditors as a group, we cannot say that it would protect adequately the interests of the junior creditors, and from the viewpoint of the public interest it would seem still less desirable. The twin objects of § 77 are to conserve the debtor's assets for the benefit of all creditors and to preserve the ongoing railroad in the interest of the public. Continental Illinois National Bank & Trust Co. v. Chicago, R. I. & Pac. Ry., 294 U.S. 648, 671–680, 55 S.Ct. 595, 79 L.Ed. 1110 (1935); New Haven Inclusion Cases, 399 U.S. 392, 431, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). While these objects cannot be pursued to the point of unfair discrimination against one class of creditors, and the secured creditors cannot be made to devote their property, uncompensated, to the public welfare, *cf.* Note, Takings and the Public Interest in Railroad Reorganizations, 82 Yale L.J. 1004 (1973), the present record falls short of presenting facts sufficient to raise the issues of discrimination among creditors or unconstitutional taking.

■ It has long been established that secured creditors may be required to defer realizing on their security for a reasonable time to permit the trustees to make efforts to reorganize the railroad. Continental Illinois National Bank & Trust Co. v. Chicago, R. I. & Pac. Ry., *supra.* As the Supreme Court has said, during the reorganization period

> "the collateral will decline in value; . . . . A claim that injurious consequences will result to the pledgee or the mortgagee may not, of course, be disregarded by the district court; but it presents a question addressed not to the power of the court but to its discretion—a matter not subject to the interference of an appellate court unless such discretion be improvidently exercised." *Id.* at 677, 55 S.Ct. at 606.

Given the relatively short time that has elapsed since the filing of the petition under § 77, the diligence of the trustee and the ICC, and the absence of any showing of irreparable harm, the district court was plainly right to respect the procedures of § 77. The time may soon come when the deferral, in the interest of others, of appellant's rights becomes so oppressive as to raise the issues the Group now seeks to assert. By inserting § 77(g), and by imposing time limits throughout § 77, Congress reflect-

---

appreciation in the value of the raw real estate.] It thus appears that by either the values used by the Administrative Law Judge or those proposed by the Group there is currently security sufficient to satisfy the bondholders.

To the available security must be added the expenditures, approved in this opinion, for capital improvements. For example, the Hoosac Tunnel, unless it is repaired, may soon have no value at all; it may be, although we do not know, that the repairs add more to the value of the Tunnel, and thus to the security of the bondholders, than they cost. If so, the expenditures increase rather than decrease the well-being of bondholders as a group. Against this must be balanced the possibility of eventual cessation of railroad operations; the Hoosac in repaired condition is valuable only to an operating railroad. The concern of the Group is that, if operations cease, the investment in the Hoosac will become valueless. But it is precisely this kind of fine balancing of probabilities that is addressed to the reorganization court's discretion. Since the Group has not, and perhaps cannot, demonstrate with any certainty that it is suffering from the continued operation and repairs to the B & M, the statutory and constitutional claims are inappropriate at this time.

ed awareness that a reorganization proceeding might be so unreasonably delayed as to be "subversive of the spirit in which [§ 77] was conceived and adopted." *Id.* at 685, 55 S.Ct. at 610. How much damage and risk a secured creditor may be required to accept in the interest of reorganization is no easy question. *See* New Haven Inclusion Cases, *supra*, 399 U.S. at 490–491, 90 S. Ct. 2054. But we say with some confidence that appellant has failed to show that it is no longer in the zone of permissible bankruptcy regulation but is instead in the zone where equitable principles, § 77(g), and the Fifth Amendment entitle it to relief from further delay.

As to the Group's more detailed complaints, we have reviewed the complained of orders and the record. We agree with the 10th Circuit in Van Schaick v. McCarthy, 116 F.2d 987, 993 (10th Cir. 1941), that during the period before a satisfactory and proper plan is worked out, the trustees may be permitted to make expenditures that are "reasonably necessary to preserve and protect [the relevant public and private] interests and maintain the integrity of the railroad, so that it may be turned over to the reorganized company as a going concern." During the 1960's the B&M apparently ceased to maintain or modernize its facilities. Part of the trustee's plan is to engage in rehabilitation and maintenance sufficient to attract customers and to prevent the line from falling into such a state that it may become impossible to rehabilitate profitably. We find nothing to suggest that the reorganization court exceeded sound discretion by approving expenditures for the transfer of 50 employees to Billerica, Massachusetts; for air conditioning at Billerica; for automatic grade crossing signals at Mechanicsville, New York; for purchase of snow blowers; and for entering into a substantial salary agreement with its chief executive officer, *see* Smucker v. Nassau County, 183 F.2d 447 (2d Cir. 1950), upon whom, more than anyone else, the responsibility for future success or failure may depend.

Similarly, the court was warranted, from the findings of the special master, which were based, we think, on substantial evidence, in allowing expenditures for repair of the Hoosac Tunnel. The findings were not clearly erroneous and, while alternative plans were proposed, and the decision involves subjective judgment, we are not persuaded that the reorganization court did not act reasonably and in the best interests of the railroad, its creditors, and the public.

Finally, the court did not exceed its allowable discretion in deferring its ruling on the so-called draw downs. Depending on future events, deferral offers potential benefits as well as hazards to appellant. We cannot now review the propriety of whatever rulings the court may later make. Such rulings, as the reorganization court has stated, will be made only after a full hearing.

Affirmed.