**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re Proceedings for the REORGANIZATION OF A RAILROAD.**
**No. 70–347.**

United States District Court, E. D. Pennsylvania.
July 2, 1974.

Covington & Burling by Charles A. Horsky and Brice Clagett, Washington D. C., and Paul R. Duke, John De Podesta, and John B. Rossi, Jr., Philadelphia, Pa., for the trustees, Penn Cent. Trans. Co.

Willkie, Farr & Gallagher by Louis A. Craco, and Walter H. Brown, Jr., New York City, and Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, Philadelphia, Pa., for Institutional Investors Penn Cent. Group.

Shearman & Sterling by Charles C. Parlin, Jr., New York City, and Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

James William Moore, Philadelphia, Pa., and Sullivan & Worcester by Joseph Auerbach, Morris Raker, and Charles W. Morse, Jr., Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford Railroad Co.

Wilmer, Cutler & Pickering by Lloyd Cutler, Washington, D. C., for U. S. Railway Ass'n.

Irwin Goldbloom, Deputy Asst. Atty. Gen., James F. Dausch, and Robert Ashbaugh, Washington, D. C., for the U. S. A.

David Berger, P. A. by David Berger, and Gerald Jay Rodos, Philadelphia, Pa., for Penn Cent. Co.

Leon Leighton, New York City, for minority stockholders of Mahoning Coal Railroad.

Morgan, Lewis & Dockius by Edward B. Cloues, II, Philadelphia, Pa., for the Fidelity Bank.

Curtin & Heefner by Edward I. Dobin, Morrisville, Pa., for Bank of New Jersey.

Kelley, Drye, Warren, Clark, Carr & Ellis by William Sorin, New York City, for Manufacturers Hanover Trust Co.

Gordon P. MacDougall, Washington, D. C., for Commonwealth of Pennsylvania.

John C. McTiernan, Albany, N. Y., for New York Dept. of Trans.

Mulholland, Hickey & Lyman by Geoffrey N. Zeh, Washington, D. C., for Railway Labor Executives' Ass'n.

Highsaw & Mahoney by William G. Mahoney, Washington, D. C., for Congress of Railway Unions.

Albert D. Brandon, Pittsburgh, Pa., for the City of Pittsburgh.

T. P. Shearer, Pittsburgh, Pa., for Pennsylvania State Legislative Board, United Trans. Union.

Theodore C. Knappen, Washington, D. C., for the Interstate Commerce Commission.

Collister Johnson, Jr., for Rail Services Planning Office, Interstate Commerce Commission.

Kenneth S. Levy, Deputy Atty. Gen., for the State of New Jersey.

MEMORANDUM IN SUPPORT OF FINDINGS AND ORDER NO. 1596 PURSUANT TO THE SECOND SENTENCE OF § 207(b) of the Regional Rail Reorganization Act of 1973

FULLAM, District Judge.

## I. *Procedural Posture*

After four years in reorganization under § 77 of the Bankruptcy Act, the estate of the Penn Central Transportation Company has reached another crucial milestone. Pursuant to § 207(b) of the Rail Reorganization Act of 1973

(hereinafter "RRRA" or the "ACT"), the reorganization court is required to determine whether or not the railroad "shall be reorganized by means of transferring some of its rail properties to the Corporation pursuant to the provisions of this Act." The Court is required to decide in favor of utilizing the RRRA unless it "finds that this Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization."

On June 25, 1974, in the case of Connecticut General Insurance Co., et al. v. United States Railway Association, et al., D.C., 383 F.Supp. 510, a three-judge court, of which the writer was one member, declared certain provisions of the RRRA to be unconstitutional, and granted an injunction partially restraining its enforcement. Specifically, the court held that the Act is unconstitutional insofar as it fails to provide compensation for the diminution in value of the Debtor's estate which would result from continuing losses from rail operations during the period preceding implementation of any Final System Plan under the statute.

The threshold question, therefore, is the effect of the Connecticut General holding upon the findings to be made by reorganization court under § 207(b) of the Act. There are several possibilities. One would be to hold that, since the certification of a Final System Plan under the statute has now been enjoined, there is no "process" to be evaluated, and therefore no need for § 207(b) findings at this time. But under § 207(b) itself, implementation of which has not been enjoined, a failure by the reorganization court to make findings by July 1, 1974 would have the effect of requiring reorganization pursuant to the RRRA. A second possibility would be to treat the Connecticut General decision as controlling, and to hold that, since the statute is unconstitutional, it must obviously be found not to provide a process which is fair and equitable. But the majority of the Connecticut General court held that the issues as to the constitutional validi-

ty of the provisions of the RRRA concerning conveyances of rail properties pursuant to a Final System Plan were not yet ripe for decision. One of the reasons advanced for declining to reach those issues was the belief that reorganization courts might make 180-day findings on this subject which would preclude the possibility of such conveyances. It thus appears that the majority of the Connecticut General court did not regard its decision as obviating the necessity for § 207(b) decisions by the reorganization courts.

At least two other factors must also be considered. The appeal period in the Connecticut General case has just commenced to run, and it would seem improvident to assume that there cannot possibly be any change in the situation during, or as the result of, the appellate process. Moreover, the Connecticut General case dealt only with issues of facial constitutionality, whereas the § 207(b) process involves the actual application of the statute. Whether or not the conclusions reached must be the same, it would seem that a somewhat different approach is required.

For all of the foregoing reasons, I have concluded that a § 207(b) determination should be made at this time and should be made on essentially the same basis as if the Connecticut General case had not been decided. However, rather than restate the analysis from my Connecticut General Opinion, that Opinion is incorporated herein.

## II. Background

From the very outset of this reorganization proceeding, it was apparent that in order to achieve a successful financial reorganization, there would need to be drastic changes in the Debtor's operations and in the regulatory environment in which it functioned. The initial task of the Trustees was to ascertain the dimensions of the problem, and to keep the enterprise afloat while the necessary studies were being conducted. Faced with an immediate cash shortage, contributed to in large measure by a con-

gressionally mandated wage settlement, the Trustees were unable to borrow money on trustees' certificates unless the certificates were to be guaranteed by the federal government. Congress responded to this initial crisis by passing the Emergency Rail Services Act of 1970, pursuant to which the Trustees were able to borrow $100 million from the private sector on the basis of government guarantees.

On February 10, 1971, seven months after their appointment, and shortly after their trustees' certificates were marketed, the Trustees filed their first report on the status of the reorganization. In that report, they stated:

". . . It is a fact that Penn Central is presently locked by circumstances beyond managerial control into a situation which had best be recognized *now* as completely precluding viability unless certain constraints are removed, or other arrangements are made to compensate for their effect" (emphasis in original).

The Trustees identified four areas in which changes were necessary: (1) elimination of losses on passenger service; (2) rationalization of the freight plant through elimination or subsidy of uneconomic lines; (3) more flexible rate and division procedures; and (4) improved labor productivity through reduction of excess employees. For convenience, these goals are referred to as "conditions to viability." Within a few months thereafter, the Trustees, aided by expert consultants, had reached a tentative conclusion that reduction of the total route mileage of the Penn Central system by about 40% (*i.e.*, to a "core" of 12,000 to 15,000 miles) would probably be required in order to make the remaining system viable. Every study since that time, including the preliminary report of the DOT and the report of the Rail Services Planning Office of the ICC filed pursuant to the RRRA, has been consistent with that view.

Beginning in 1971, and continuing until immediately before enactment of the RRRA, the efforts of the Trustees were directed to attempting to achieve the conditions of viability. They met with limited success in some areas and near total failure in others. Through negotiations of contractual arrangements with Amtrak and various regional commuter authorities, the Trustees succeeded in substantially reducing, although not eliminating, the losses on passenger service. But available abandonment procedures failed to produce prompt disposition of abandonment applications. On the labor front, a nationwide settlement of the longstanding fireman-manning dispute provided some improvement, but persistent disputes over the appropriate sizes of train crews, and over work rules, were not resolved. The Trustees' reports of February and October 1972 stressed the need for greater progress in achieving the conditions to viability.

In their January 1973 report, the Trustees reported that, as a result of interim losses and the condition of the physical plant, substantial government funds would be needed in order to make the Penn Central viable within a permissible time period. At about the same time, having exhausted the lengthy procedures of the Railway Labor Act, without success, in their attempt to obtain a resolution of the crew consist dispute, the Trustees promulgated their new work rules, designed to achieve, solely by means of attrition, reductions in the size of crews, except where arbitrators might find, in particular cases, that such reductions would impose excessive work loads or be inconsistent with safe operations. The promulgation of the new work rules precipitated a strike, and Congress responded on February 9, 1973, by the passage of Senate Joint Resolution 59-2, which, in effect, nullified the work rules changes, required the parties to maintain the *status quo* for a further period of 90 days, and directed the Department of Transportation to make a study of the problems of railroads in the northeast and to report to the Congress within 45 days.

The time within which the Trustees were permitted to ratify or disaffirm executory contracts, and within which a reorganization plan was to be filed, had been extended from time to time; the then current extension was due to expire April 1, 1973. On March 6, 1973, I filed Memorandum and Order No. 1137, granting a further extension, but directing the Trustees, not later than July 1, 1973, to file either a plan of reorganization for the Debtor, or their proposals for liquidating the enterprise. In the course of that Memorandum, I made the following observations:

"Whether the constitutional limit [of interim erosion] has been exceeded depends primarily upon how the remaining assets are to be valued; and this in turn may well depend upon how those assets are to be used at the conclusion of this reorganization. Under any view of the matter, it seems clear that the point of unconstitutionality is fast approaching, if it has not already arrived. . . .

"The essence of § 77 of the Bankruptcy Act is that the legal remedies normally available to creditors may be held in suspension for a reasonable time in order to permit rehabilitation of the enterprise. Whenever it appears that there is no genuine likelihood of ultimate success, the legal and constitutional justification for restraining creditors from exercising their normal remedies disappears. . . . [I]t is apparent that the required profitability cannot be achieved unless substantial further progress is made in the immediate future to meet the conditions upon which the projected profitability is based. . . .

"It has long been apparent that the particular problems of Penn Central cannot be completely divorced from problems of national transportation policy. Railroads are, after all, a regulated industry. However unappealing may be the notion that a regulated industry can become bankrupt, the Trustees' efforts to rehabilitate the Debtor are circumscribed by existing statutes and regulations. To the extent that these statutes and regulations . . . preclude the exercise of self-help in achieving profitability, the legislative and executive branches of government must be looked to for solutions, if solutions are to be forthcoming.

"And this is as it should be, for it is those branches of government which should determine whether the kind of railroad which could emerge from a private income-based reorganization would be consistent with long-range goals of national transportation policy. Such matters . . . are clearly beyond the province. of the Trustees, the other parties to this reorganization, and this Court.

. . . . . .

"The legal and constitutional rights of the parties to this reorganization should be evaluated in the light of whatever changes Congress sees fit to enact.

"By the same token, however, this Court cannot ignore the realities of the Debtor's situation. On the basis of the record to date, it appears highly doubtful that the Debtor could properly be permitted to continue to operate on its present basis beyond October 1, 1973." In re Penn Central Trans. Co., 355 F.Supp. 1343, 1344–1346 (E.D.Pa.1973).

Throughout the balance of 1973, as a result of careful and intensive effort by both Houses of Congress and the Executive Branch, the legislation which ultimately became the RRRA took shape. At the same time, the parties were proceeding before the ICC for approval of various proposed plans of reorganization/liquidation, and some of the parties were pressing in this Court for prompt termination of rail operations and dismissal of the § 77 proceeding itself. By a series of actions and inactions which need not be detailed here, this Court held all such proposals in abeyance pending action by Congress on the RRRA.

It is clear that, apart from the impact of the RRRA, there has been no fundamental improvement in the Debtor's prospects. In reviewing the Debtor's situation pursuant to the initial requirement of § 207(b) of the Act (the so-called "120-day findings"), I concluded:

"[T]here is no prospect that, in the absence of fundamental changes which the Trustees are precluded from bringing about, the Debtor can be reorganized as an operating railroad. Even if the optimal configuration [of the rail system] could be achieved, it appears unlikely that the Trustees could obtain the resources to sustain operations in the interim, or that the final result would make it possible to provide for interim administration expenses and support a recapitalization on a fair and equitable basis." In re Penn Central Trans. Co., (E.D.Pa. 1973), slip op. at p. 19.

■ Unquestionably, therefore, the presumption in favor of accepting the solution presented by the RRRA is unusually strong, not only because the Act expressly incorporates such a presumption, but for obvious practical reasons as well. A court would be justified in precluding resort to the procedures of the RRRA only for the most compelling reasons.

### III. *The Merits*

#### A.

The Indenture Trustees on behalf of their bondholders, the Institutional Investors, the New Haven Trustee, and the Penn Central Company, the sole stockholder of the Debtor, all press for a finding that the Act does not provide a fair and equitable process. Thus, opponents of the Act include all of the secured creditors, all unsecured creditor interests actively participating in the reorganization proceeding, and all of the stockholder interests. No creditor or stockholder has expressed a different view. The Trustees of the Debtor urge the Court to make a conditional finding based upon their contention that the Tucker Act provides an adequate remedy for any unconstitutional lack of fairness and equity which might result from application of the Act. In effect, they suggest a finding which would remain valid only upon condition that the availability of a Tucker Act remedy is conclusively established by a decision of the Supreme Court of the United States.

■ United States Railway Association and the Department of Justice, in a joint presentation, urge an affirmative finding that the Act does provide a fair and equitable process. Their contentions may be summarized as follows: Congress has determined that the Act provides a fair and equitable process, and has established machinery adequate to insure that its intention will be carried out. This Court should not attempt to second-guess the Congressional judgment. The only possible basis for a finding that the Act does not provide fair and equitable process would be a conclusion that the end result would violate constitutional rights. In the unlikely event that such a contingency should arise, the Tucker Act provides an adequate remedy.

■ The record contains a great deal of opinion evidence, with supporting documentation and calculations, designed to show that it is highly improbable, even impossible, for Conrail to be a successful enterprise. Taken as a whole, this evidence is to the effect that the common stock of Conrail will have little or no value, because the corporation will be unable to generate enough net rail operating income to meet its fixed charges and leave anything significant for the stockholders; and that Conrail will run out of cash within a couple of years after commencing operation. No evidence has been offered to the contrary, nor has the government effectively challenged the salient features of the creditors' evidence. Nevertheless, I agree with the contention of the government that it would be both premature and inappropriate for this Court to ex-

press a judgment as to Conrail's prospects for viability.

USRA is required to design a rail system which is both "financially self-sustaining" and "adequate to meet the rail transportation needs and service requirements of the region." It is true, of course, that the mere existence of this Congressional mandate cannot guarantee that the attempt will be successful. But it is obviously beyond the power of a district judge to substitute his own assessment of the feasibility of a legislative program for that of Congress. Any such attempt would be squarely contrary to the concept of a tripartite form of government.

■ The task of designing a financially viable rail system, and therefore of making at least the initial assessment of its viability, has been committed to USRA, and not to this Court. Congress has reserved a veto power over USRA's recommendations for the Final System Plan. The task of evaluating Conrail's stock and other securities has been committed to the Special Court, and is to be performed at a time when all concerned will have more of the necessary information than is now available. It is proper to assume that, if USRA finds it impossible to design a profitable system, it will say so. In any event, the validity of its viability assessment can be tested before the Special Court at the appropriate time.

■ Thus, if this Court's § 207(b) finding were to depend solely upon the question of the present financial prospects of Conrail, there would be nothing for this Court to decide. But § 207(b) plainly contemplates a meaningful decision of some sort; I am reluctant to accept the suggestion that § 207(b) was inserted merely to create the appearance of a judicial act, and not its reality, or was designed merely for camouflage purposes, so that what is really an eminent domain statute would have the appearance of a reorganization statute. I see no need to go beyond the language of § 207(b) itself. In the terms of that section, this Court is required to determine whether the RRRA "provide[s] a *process* which would be fair and equitable to the estate of the railroad in reorganization . . . ". I interpret these words to mean that the reorganization court is now to determine whether, if the procedures of the Act were to be followed in the case of the particular debtor, those procedures can be characterized as "fair and equitable" to the estate. The focus is upon the process; concrete assessments of the results of the process are obviously impossible at this time. (It is this very uncertainty which makes it necessary to consider the deficiency judgment and stock issues discussed below.)

■ There are several areas of concern with the adequacy of the statute's procedures. In the first place, several related problems stem from the provisions of the Act regarding the conveyances of rail properties to Conrail pursuant to the Final System Plan. Understandably enough, the Act provides that, once a Final System Plan has been approved by USRA, submitted to Congress and not rejected, and certified to the Special Court, no court can change it or interfere in any way with its implementation. The Final System Plan is to represent the judgment of USRA and Congress concerning the best rail system for meeting the needs of the region, and there is no reason for participation by the parties, or by the courts, in those determinations. But the Final System Plan also represents a preliminary determination of the values of the properties to be conveyed, and of the values attributable to the consideration to be paid. Under normal concepts of due process in the administrative field, one would expect to find some opportunity for obtaining and considering the views of the affected property owners in advance of such value determinations. The drafters of this Act apparently considered that the later opportunity for hearings before the Special Court would obviate the need for administrative hearings. The validity of this approach would seem to

turn upon whether the Special Court is expected to give any significant degree of deference to the administrative valuations. On that point, the statute is not altogether clear.

Under § 209(c), when delivering the Final System Plan to the Special Court, USRA is required to certify, *inter alia,*

"(3) The amount, terms, and value of the securities of the Corporation (including any obligations of the Association) to be exchanged for those rail properties to be transferred to the Corporation pursuant to the final system plan . . . .".

Section 303(c) requires the Special Court, "giving due consideration to the findings contained in the final system plan," to decide, *inter alia,* whether the proposed exchanges would be fair and equitable.

While the issue is not free from doubt, I am inclined to believe that any defect inherent in the absence of administrative hearings on the questions of valuation can safely be disregarded for present purposes, on the assumption that the Special Court would give to USRA's valuation findings only such weight as would be legally permissible.

A more serious, or at least more noticeable, problem stems from the fact that the conveyances and transfers pursuant to the Final System Plan are mandated to occur in advance of any judicial scrutiny and in the absence of any judicial determination as to the fairness and equity of the proposed exchanges. Arguably, even this defect might be remedied if the Special Court were empowered to set aside the conveyances if it should find unfairness or inequity. But it is clear that the Act does not permit any such curative action by the Special Court. And finally, even this series of problems could perhaps be overlooked if the Special Court could, by some alternative means, see to it that the respective estates received the "constitutional minimum" due them from their properties. But it is entirely clear that the Special Court, upon finding that the transfers

are less than fair and equitable, is limited to reallocating the securities specified in the Final System Plan and, if the result is still unfair or inequitable, to imposing a deficiency judgment against Conrail.

USRA is authorized to issue up to $500 million of debt obligations guaranteed by the United States, and to make those securities available to Conrail for use in purchasing rail assets. The extent to which this authority would actually be exercised would apparently be determined by USRA, in formulating the Final System Plan. It is arguable, for example, that if USRA should propose a plan which did not contemplate the use of any government-guaranteed obligations as part of the consideration for rail assets, the Special Court would be unable to require such issuance. Be that as it may, it is clear on the record in this case that rail assets of Penn Central would comprise a very large percentage of the total Conrail system, and there is every reason to suppose that the included properties would be worth considerably more than $500 million. Since no one knows, or can know, at this time, the value of any stock or other securities which Conrail might issue, it would be highly imprudent to assume that there will be no need to resort to the deficiency judgment. Yet obviously, such a judgment would be relatively pointless, serving merely as a further reduction in the value of the common stock.

Another set of problems relating to the conveyance features of the Act arise from the many uncertainties concerning valuation standards. Before irretrievably committing the estate of the Debtor to the processes of the RRRA, it would be extremely helpful, and perhaps actually essential, that the ground rules concerning valuation should be clearly perceived. The statute makes clear that neither more nor less than the "constitutional minimum" payment is intended. The legislative history of the Act suggests that many responsible public officials may be proceeding on the assumption that the common stock of Conrail

(*i. e.*, the capitalized value of its prospective earnings) necessarily and automatically establishes the value of the rail assets conveyed to Conrail, even if those assets had a higher liquidation value, and even though their value for "highest and best use" might be much greater. Indeed, the government makes precisely that argument in the present proceeding. It becomes necessary, therefore, to make two comments on that subject: (1) If the government's definition of "constitutional minimum" is correct, then every railroad in reorganization would be better off in immediate liquidation, than under the processes of the RRRA. (2) If that valuation approach is incorporated in the Final System Plan submitted to Congress, but later proves to have been incorrect, then (a) at the very least, the actual capital structure and viability prospects of Conrail would be drastically different from that proposed by USRA and reviewed by Congress; and (b) if the government and the Trustees are correct in their assertion that there is a Tucker Act remedy, the direct cost to the taxpayers might prove vastly greater than Congress intended. In short, advance clarification of the valuation standards would seem to be extremely desirable from the standpoint of Congress and USRA, as well as from the standpoint of the bankrupt estates.

Another problem relating to valuation is the lack of any mechanism for establishing a relationship between the values to be assigned to the rail properties conveyed, and the valuation of the interests of secured creditors holding liens against those properties. There are several facets to that problem. In the first place, the timing is off. In determining whether a plan of reorganization is fair and equitable, it is necessary to determine the extent to which particular groups of creditors are secured, and the value of their respective securities, so as to be sure that they will receive equivalent value before any junior classes of claimants participate. Since the exchanges under RRRA would be between

Conrail and the Debtor's estate, rather than the creditors, the problem of later recognition of the correct treatment of the creditors in a reorganization plan would be rendered quite difficult.

Moreover, the valuation of the property for sale to Conrail might very well not be on a basis which would permit rational allocation of the consideration on a segment-by-segment basis for purposes of later assigning lien values. And that difficulty would itself be greatly magnified by the fact that Conrail will presumably be made up of parts of various existing railroads, blended together in a smaller system designed to handle the traffic now being handled by several different railroads.

A further difficulty with the statute is the lack of precision in defining what "other benefits of the Act" are to be taken into account as part of the purchase price for the rail properties conveyed to Conrail. For example, if the amount payable for labor protection (up to $250 million is authorized by the Act) is to be charged back against the estate as a credit against the purchase price payable for the rail properties, a major incentive for utilizing the processes of the Act would be removed.

Separately considered, the problems specifically relating to valuation issues are not necessarily such as to render the Act's procedures unfair and inequitable, but they are factors which enter into the overall assessment.

### B.

As discussed in Part IV of my concurring Opinion in the *Connecticut General* case, analysis of the RRRA reveals a mixture of sale, reorganization, and eminent domain concepts. Whatever may be the appropriate label, the fundamental disagreement among the parties concerns the constitutional propriety of compelling the Debtor's estate to exchange some of its rail properties for Conrail stock. It was unnecessary to decide that question in the *Connecticut General* case, but I see no way to avoid

it in the present litigation, where an evaluation of the fairness and equity of the RRRA is mandated.

■ All of the reported cases are uniform in ruling that, when private property is taken for public purposes in exercise of the power of eminent domain, assurance of payment in cash or equivalent is a constitutional requirement. Almota Farmers Elev. & Whse. Co. v. United States, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970); United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); VanHorne's Lessee v. Dorrance, 2 Dall. 304, 1 L.Ed. 391 (Cir.Ct.Pa.Dist. 1795); see also, Nicholas, Eminent Domain § 8–2 (3d Rev.Ed.1970) and cases cited therein. In the present case, the government argues that the RRRA is not an exercise of the power of eminent domain, but that in any event the "just compensation" requirement of the Fifth Amendment can be fulfilled by payment in Conrail stock.

Essentially, it is the position of the government that if a secured creditor can be required to take inferior securities as part of a reorganization plan, it follows that the Debtor's estate can be required to take stock in exchange for property subject to the liens of secured creditors. In other words, the assumption is that the kind of governmental compulsion represented by the RRRA is qualitatively identical to that represented by the provisions of § 77(e) of the Bankruptcy Act relating to the confirmation and cram-down of a plan of reorganization; and that "just compensation" can be equated to § 77's requirement that a plan be "fair and equitable."

While the government's argument cannot be dismissed out of hand, I believe Judge Friendly's observation in the New Haven litigation is pertinent here:

"[T]he present case may well be one where a volume of history must prevail over a page of logic." New York,

N. Y. & H. R. R. Co. First Mortgage 4% Bondholders Committee v. United States, 305 F.Supp. 1049, 1055 (S.D. N.Y.1969).

By and large, the pre-§ 77 equity receiverships did not result in the dismantling of railroads, because the economic factors were such that continuation of the enterprise produced greater values than liquidation would have produced. The creditors foreclosed their liens, but because the railroad was worth more alive than dead, they continued to operate it. Sound financial planning required that fixed charges be realistic; the solution was to fix a debt-equity ratio which made it necessary for some of the bondholders to receive stock. The imposition of § 77's fair and equitable standard, with the judicial gloss of the absolute priority rule, was simply a more efficient and just way of attaining the equity receivership result. For railroads plagued by over-capitalization, both the equity receivership mechanism and § 77 provided a method of avoiding unnecessary losses to private interests, while fostering the public interest in rail transportation.

As pointed out in my *Connecticut General* concurrence, it is the reasonable prospect of preserving "going concern" values in excess of liquidation values which comprises the constitutional underpinning for § 77 itself. And in the most pertinent precedent, the New Haven Inclusion Cases, 399 U.S. 392, 90 S. Ct. 2054, 26 L.Ed.2d 691 (1970), the Supreme Court seems to suggest that even a voluntary agreement to accept stock in payment for rail properties sold pursuant to § 77(b)(5) may be unfair and inequitable in the absence of sound guarantees as to the value of the stock.

There are significant differences between the distribution of stock to secured creditors in connection with a reorganization, and the scheme of the RRRA. Under the Act, a debtor whose rail properties, by definition, do not now produce income in excess of fixed charges (or for that matter in excess of

operating expenses), and have no present prospect of doing so, is required to exchange its properties for the stock of Conrail. The Debtor is forced to forego obtaining whatever value there is in its rail assets, in return for the attendant risks of Conrail's equity securities. This is not to say that Conrail stock will necessarily involve excessive risk, but rather to point out that the risk is being imposed by the government, without the consent of the interested parties.

A requirement that property be exchanged for stock is in essence a denial of the railroad's right to terminate service and liquidate. It is this control over the ultimate disposition of the Debtor's assets that appears to be equivalent to an exercise of the power of eminent domain. But if there is some independent basis for sustaining compulsory continuation of rail operations, there would not necessarily be a Fifth Amendment violation in requiring acceptance of stock in exchange for the properties. The government has now argued, for the first time, that there will never be any necessity to impose a deficiency judgment against Conrail, because, as a matter of law, the value of the Debtor's rail assets equals the value of Conrail's common stock. Ignoring for the moment the complications stemming from the fact that Conrail will be composed of properties from more than one estate, it is significant that this new valuation argument is necessarily based upon the premise that the government can properly require railroads to operate indefinitely.

The justification for any such thesis must be found in the public interest of avoiding the widespread dislocations which would result from termination of the Debtor's rail service. The issue is not whether governmental action may properly be taken to avoid such dislocations, but rather whether the method selected by Congress, the RRRA, is a constitutional method of achieving that legitimate public goal. In short, the question is whether the government can avoid such disruptions by imposing the costs and risks of a possible solution upon the Debtor's estate. Support for an affirmative answer to that question is to be found, if at all, in the concept that the privilege of a government-protected railroad monopoly gives rise to a residual claim in the public for continuation of railroad operations, to wit, the notion of "common carrier responsibility" which finds statutory expression in § 1(18) of the Interstate Commerce Act.

The legitimacy of "common carrier responsibility" is, of course, not in question, but the duration of that responsibility is. Stated briefly, the issue is whether the government may treat a common carrier whose government-sponsored monopoly is no longer profitable, as if it remained profitable.

In the so-called Granger case, Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1876), the Supreme Court articulated the "public interest" theory upon which economic regulation was based for almost 60 years:[1]

"Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to the use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to control." 94 U.S. at 126.

In the case of railroads, the right to withdraw is not unqualified. State legislatures early authorized regulatory agencies to control the abandonment and termination of services of rail carriers.

1. In Nebbia v. N. Y., 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the Court abandoned the necessity of finding that a business activity affected the public interest as a condition precedent to state or federal regulation.

Since railroads operate under government-created monopolies, that extension of regulatory power was both logical and lawful, if the carrier's total operations were profitable. Cherington, The Regulation of Railroad Abandonments, 17–25 (Harv.1948).

■ However, when a carrier's operations are not profitable, it is unconstitutional to require their continuance. Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920); Bullock v. Florida ex rel. Railroad Commission, 254 U.S. 513, 41 S.Ct. 193, 65 L.Ed. 380 (1921); Mississippi R. R. Commission v. Mobile & Ohio R. R. Co., 244 U.S. 388, 37 S.Ct. 602, 61 L.Ed. 1216 (1917). Enactment of the Transportation Act of 1920, which contains what is now § 1(18) of the Interstate Commerce Act, did not alter this constitutional doctrine. Railroad Commission v. Eastern Texas R. R. Co., 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924). The Supreme Court has recently recognized the continuing validity of those cases, in the *New Haven Inclusion* case, *supra* (399 U.S. at 491, 90 S.Ct. 2054). Recent decisions in the Third Circuit, In the Matter of Penn Central Transportation Co., 494 F.2d 270 (3d Cir. 1974) (Columbus options case), and in the First Circuit, In re Boston & Maine Corp., 484 F.2d 369 (1st Cir. 1973), as well as the decision in *Connecticut General, supra,* are all to the same effect. Indeed, the government does not dispute, as an abstract principle of constitutional law, the doctrine that there may be a point beyond which a railroad cannot constitutionally be required to continue to provide service.

■ It appears to be the government's contention that in the present case the Debtor can be forced to continue rail operations, not indefinitely, perhaps, but at least for a substantial further period, without regard to whether the accruing administration expenses reduce the value of the estate, or whether the end result will be to accord to the estate less than its present liquidation value. The monopoly rationale of railroad regulation, as noted above, does not support that argument. And I am unable to perceive any basis in the general concept of police power for upholding that result.

■ The government may, of course, preclude uses of property which are harmful to the public, and even render valueless under certain circumstances private property without compensation in order to obviate the harm, *e. g.*, Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (destruction of cedar trees spreading disease to apple orchards). But, except for the monopoly rationale, there is no authority for affirmatively requiring uncompensated continuation of a use of property merely because cessation of that use would be detrimental to the public.[2] Indeed, there are constitutional limits to governmental restrictions of the use of property, when such restrictions are confiscatory. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

■ I am satisfied, therefore, that the use of common stock to pay for the rail assets conveyed pursuant to the Final System Plan cannot be justified on the basis of any constitutional doctrine yet announced by the Supreme Court. In my view, the RRRA in its present form does violence to the Constitution, whether considered as a reorganization statute, or as an eminent domain statute, or as a combination of the two. This does not, however, necessarily mean that the use of stock as payment might not be proper in a slightly different statutory setting.

---

2. Grade crossing cases provide a further analogy. If the railroad's facilities are inadequate and dangerous, the railroad may be assessed the cost of the improvement. Atchison, Topeka & S. F. Ry. v. Public Utility Commission, 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953). But if the project is needed merely to improve the flow of traffic on an interstate highway, the railroad is not required to bear the cost, Nashville & St. Louis Ry. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935).

From the standpoint of creditors, interim erosion is the most pressing problem. Given protection against that ongoing loss, the delay involved in structuring a Conrail and ascertaining the reciprocal values involved would surely be constitutionally acceptable. From the standpoint of the public interest, achieving a permanently satisfactory rail system at minimal public cost is the important goal. The increased public cost for supporting interim operations would seem to be relatively modest in comparison to the total cost of outright condemnation.

If a solution can be found to the immediate problem of interim erosion, several possibly acceptable alternatives involving the use of Conrail stock to pay for some or all of the assets could readily be explored. The basic techniques of the RRRA might be used to produce a plan of reorganization which could properly provide for the use of stock, if the necessary procedural safeguards were added. The values assigned to the Conrail stock might be underwritten in some fashion. Or, it might be possible to construct a satisfactory constitutional theory which would permit the use of stock to the extent of the excess of going concern value over net liquidation value. All of these matters are obviously not within the proper scope of this Court's responsibility. They are mentioned here only for the purpose of emphasizing that, notwithstanding the categorical nature of some of the arguments presented in this case, I am not persuaded that the inevitable choice is between the RRRA in its present form, on the one hand, and immediate nationalization of the railroads on the other.

## IV. Conclusions

Throughout the *Connecticut General* litigation and the proceedings under § 207(b) of the RRRA, as well as in the post-RRRA segment of the Penn Central reorganization proceeding itself, there has been constant and repeated emphasis upon the various inadequacies of the RRRA. It is important, however, to emphasize the many positive aspects of the statute. It undoubtedly represents a constructive and imaginative approach toward a solution of problems which have plagued this country for generations, but which have compellingly surfaced only in recent years. I agree with the Trustees that the basic approach of the statute is fundamentally sound. If I were persuaded that Congress had intended to permit recourse to a Tucker Act remedy in the event that implementation of the RRRA proved violative of constitutional rights, an affirmative § 207(b) finding might be permissible. But, in the absence of any clearly expressed provision to that effect in the statute, I believe reliance on that possibility would be misplaced.

It is easy to picture the present controversy as a dispute between grasping creditors, on the one hand, and the public interest, on the other. But that simplistic picture is entirely inaccurate. In the first place, the creditors and stockholders of the Penn Central Transportation Company have exhibited commendable patience and restraint in supporting the continued operation of the railroad during reorganization, at a cost of nearly $1 billion. More importantly, the immediate impact of continued loss operations is being absorbed by state and local taxing authorities, and by prebankruptcy personal injury claimants. whose judgments have been held in abeyance for more than four years, and cannot be paid until all senior claimants are taken care of in a plan of reorganization. Whatever may be said of trade creditors and investors, surely the local taxing authorities and personal injury claimants cannot be said to have made an investment decision of any kind or to have extended credit voluntarily to the railroad.

Among the 160,000-odd stockholders, and the upwards of 50,000 bondholders, I have no doubt that a significant portion do not readily conform to the image of sophisticated investors. And even if they were all established financial institutions, some mention should be made of the generally accepted view that our sys-

tem of private enterprise can best be preserved if investor confidence is not unnecessarily jeopardized.

Be all that as it may, for the reasons discussed above, I am compelled to conclude, reluctantly, that the RRRA falls short of providing a process which would be fair and equitable to the Debtor's estate in the following respects:

1. The Act requires the Debtor to continue to operate the railroad, for its own account, until such time as the Final System Plan is implemented. There is no prospect that such operations can be conducted, except at huge losses. The Act makes no provision for compensation to the estate or its creditors for the resulting erosion.

2. The Act does not permit judicial determinations with respect to the values of the properties to be conveyed, or the value and adequacy of the consideration to be paid for such properties, in advance of the conveyance, and the subsequent judicial review of these matters does not affect the finality of the conveyance.

3. Since USRA, with the approval of Congress, is to determine the nature of the consideration to be paid for the transferred assets, and judicial remedies are limited to reallocation of the securities proposed by USRA and the entry of a deficiency judgment against Conrail, the Act does not assure that the Debtor's estate will actually receive the equivalent of the "constitutional minimum" value of the properties conveyed.

4. It is beyond the power of a reorganization court, including the Special Court, to order the conveyance of properties free and clear of liens in exchange for common stock, except perhaps to the extent that the sale price exceeds the net liquidation value of the property conveyed. This is particularly true where there is no guarantee of the value of the stock or its future earnings.

5. Implementation of the Final System Plan pursuant to the Act cannot be regarded as equivalent to consummation of a plan of reorganization, or a step in or part of such a plan of reorganization, because (a) the conveyances would become irrevocable before there would be any opportunity for participation by the estate or its creditors in the valuation process, (b) the conveyances would become irrevocable in advance of any judicial review of fairness, valuations, etc.; (c) the conveyances would become irrevocable before there could be any determination of the relative rights of creditors and the value of their security or their treatment in the reorganization process; the creditors would merely lose their liens on the properties conveyed.

6. Implementation of the Final System Plan cannot be legally justified as a sale of property by the Trustees, or as consummation of a reorganization plan, for the reasons specified above. To the extent that the Act represents an exercise of the power of eminent domain, it is unfair and inequitable, in that it does not provide for just compensation in cash or its equivalent, assured in advance of the conveyance. There is no other basis upon which the constitutional validity, or the fairness and equity, of implementation of the Act can be upheld.

7. Under the provisions of the Act, the only judicial determinations which can have significant effect in protecting the rights of the railroad estates and their creditors must be made at a time when substantially all of the information pertinent to those judicial decisions is unknown and unknowable.

Accordingly, an appropriate order has been entered, expressing this Court's finding that the RRRA, in its present form, does not provide a process which would be fair and equitable to the Debtor's estate.

### ORDER NO. 1596

And now, this 1st day of July, 1974, in conformity with the requirements of § 207(b) of the Regional Rail Reorganization Act of 1973, this Court finds and hereby orders:

1. That the Regional Rail Reorganization Act of 1973 does not provide a

process which would be fair and equitable to the estate of the Debtor.

2. That the reorganization of the estate of the Debtor shall not be carried out pursuant to the Regional Rail Reorganization Act of 1973.

3. That this Finding and Order shall be stayed pending the final determination of the Special Court pursuant to the Act.